THOMAS SZOTT
Assistant United States Attorney
Wyoming Bar Number 7-5139
P.O. Box 668
Cheyenne, WY 82003
(307) 772-2124
Thomas.Szott@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **ANDREW LAMBERT SILICANI,** | |
| Petitioner, | |
| v. | **Case No. 17-CV-197-F** |
| **UNITED STATES OF AMERICA**, | |
| Respondent. | |

---

### United States' Response to the Defendant's Motion Under 28 U.S.C. § 2255

---

Petitioner Andrew Lambert Silicani pled guilty to four counts of using the mail in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958, and this court imposed an aggregate sentence of 420 months.  In November of 2017, Silicani timely filed a motion and supplement collaterally attacking his sentence under 28 U.S.C. § 2255.  Silicani proffers two claims in his § 2255 pleadings.  First, raising a unit-of-prosecution issue, Silicani claims his four counts of conviction only constituted one violation of 18 U.S.C. § 1958, and thus his statutory-maximum sentence should have been 120 months.  Second, Silicani claims the magistrate judge who handled preliminary appearances in his case was biased or had a conflict of interest based on the judge attending the same church as Silicani's intended victims.  For the reasons discussed below, this court should reject Silicani's claims.

**BACKGROUND**

**I. Facts**

Adopted as a newborn, Andrew Silicani originally lived with his mother and father in California. (ECF No. 49 at 13).[1] Silicani had a difficult upbringing, and his parents eventually sent him to a boarding school in Michigan, where he graduated from high school a year early. (ECF No. 49 at 13-17). Meanwhile, his parents divorced in 2008. (ECF No. 49 at 15).

After graduating, Silicani returned to California to live with his father, but he began abusing controlled substances and engaging in criminal behavior. (ECF Nos. 49 at 10, 50-2 at 16-17). He completed a residential treatment program in Arizona in December of 2010 and subsequently moved to Cheyenne, Wyoming, to live with his mother. (ECF No. 49 at 10-11, 16-17; ECF No. 50-2 at 17-18).

Shortly after moving to Cheyenne, Silicani stabbed two victims in separate attacks. On January 17, 2011, he stabbed a marijuana dealer in the arm (but was never prosecuted). (ECF Nos. 49 at 12; 50-4 at 06:15, 07:20). Ten days later, on January 27, Silicani and some acquaintances were driving in an SUV after partying, drinking, and smoking marijuana in a Cheyenne hotel room. (ECF No. 50-2 at 15-16). As they were driving, they saw a man rollerblading along the street. (ECF No. 50-2 at 15). Silicani and one of his acquaintances emerged from the SUV; Silicani stabbed the victim six times in the arm, chest, abdomen, and buttock; and the acquaintance took the victim's backpack. (ECF No. 50-2 at 14-15). Identified as a suspect because he dropped his

---

[1] Unless otherwise specified, all citations to ECF documents refer to the underlying criminal case, 15-CR-57-F. Citations to the change-of-plea and sentencing transcripts also refer to that case.

cellphone at the scene, Silicani later confessed to the robbery and admitted he thought he had killed the victim.  (ECF No. 50-2 at 14-15).

Eventually, Silicani pled guilty to state felony charges of Conspiracy to Commit Robbery and Robbery with Bodily Injury.  (ECF No. 50-2 at 1).  He received concurrent five-to-seven-year prison terms, and after failing to complete boot camp, he ultimately arrived at the Wyoming State Penitentiary ("the penitentiary") in Rawlins to serve his sentences.  (ECF Nos. 49 at 11, 17).

Meanwhile, Silicani's mother remarried in 2012.  (ECF No. 49 at 15).  Anticipating Silicani's parole, his mother and stepfather were preparing for him to live in their home.  (ECF No. 45 at 1-2).

However, while imprisoned at the penitentiary, Silicani decided to hire a hit man to murder his mother and stepfather so he could collect money from his mother's life insurance.  (ECF No. 49 at 5).  In the fall of 2014, Silicani solicited a fellow inmate to commit the murders.  (ECF No. 49 at 5).  The fellow inmate contacted prison officials and eventually began cooperating with the FBI.  (ECF No. 49 at 5).

Aided by the fellow inmate, the FBI conducted an undercover investigation.  (ECF No. 49 at 5).  After the FBI established an undercover P.O. Box number in Colorado, the fellow inmate told Silicani the P.O. Box belonged to a hit man.  (ECF No. 49 at 5).  Silicani began corresponding and negotiating with the purported hit man (actually FBI agents), sending four letters from the penitentiary to the Colorado P.O. Box address between December 29, 2014, and February 18, 2015.  (ECF No. 49 at 5-7).  Among other things, Silicani agreed to pay $100,000 "for Both Jobs." (ECF No. 49 at 5-7).

Early in the investigation, the fellow inmate began sending letters to the FBI to report what was happening at the penitentiary.  In one such letter, dated December 19, 2014, the fellow inmate

reported, "Silicani told me after his parents in [C]heyenne were dead and he got the money from the insurance, car, house, etc. he wanted his Dad in California to be killed as well so he can collect from that one too." (ECF No. 50-3 at 3).

On February 18, 2015, an undercover agent posing as the hit man met with Silicani at the penitentiary. (ECF No. 49 at 7; ECF No. 50-1).[2] They discussed the details of the murders-for-hire. Among other things, Silicani explained his mother had a $500,000 life insurance policy, of which he and his stepfather were co-beneficiaries. (ECF No. 50-1 at 21:20). Thus, if both his mother and stepfather were killed, Silicani would receive the full $500,000. (ECF No. 50-1 at 21:30, 21:45, 22:45). Silicani could not pay anything up front, so the undercover agent asked for $125,000 instead of the previously-agreed-upon $100,000. (ECF No. 50-1 at 22:00, 22:25). Silicani agreed, saying he would be willing to go as high as $150,000. (ECF No. 50-1 at 22:30).

In his conversation with the undercover agent, Silicani offered three so-called justifications for arranging the murders:

| | |
|---|---|
| **Silicani:** | The way I look at it is, I mean, how I justify it to myself probably doesn't even matter to you, the, the facts that matter . . . |
| **Agent:** | Oh it does, it does. Sure. |
| **Silicani:** | Well, the way I justify it is, they're, it's not, it's not my, it's not blood. And second, they would easily turn me in if anything were to happen. So that's how I justify it in my head. If someone's willing to roll over on me, I really don't care. So . . . |
| **Agent:** | Right. |
| **Silicani:** | So it's . . . |
| **Agent:** | They don't mean anything. |

---

[2] ECF No. 50-1 is a recording of the meeting. Silicani and undercover agent begin speaking at approximately 17:45 on the recording.

| **Silicani:** | No, and . . . |
|---|---|
| **Agent:** | You disown them pretty much. |
| **Silicani:** | Yeah.  And, and so I don't really care.  The way I look at it is, this money's more of a help than they are right now, so. |
| **Agent:** | Right. |
| **Silicani:** | That's how I look at it. |

(ECF No. 50-1 at 23:20).

The undercover agent asked whether Silicani cared about the details of the murders. Among other things, the agent asked Silicani, "Now, you don't want them to suffer, you don't want them to see it coming, or you don't care?"  (ECF No. 50-1 at 24:25).  Lowering his voice, Silicani said something like, "I don't even care."  (ECF No. 50-1 at 24:29).

## II.     Procedural History

Having already obtained a criminal complaint, the FBI arrested Silicani at the penitentiary after the undercover meeting on February 18.  (ECF Nos. 1, 13, 14).  Later, in an indictment filed on March 19, 2015, the grand jury charged Silicani with four counts of using the mail in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958.  (ECF No. 29).  Subsequently, the United States offered Silicani a plea agreement to a stipulated thirty-five year (420 month) sentence with a provision that the state would not prosecute him for his underlying conduct. (Change-of-Plea Transcript at 22).

Instead of accepting the plea offer, Silicani appeared before this court and entered "cold" guilty pleas to all four counts of the indictment on April 27, 2015.  (ECF No. 49 at 3; Change-of-Plea Transcript at 22, 25-26).  Among other things, Silicani admitted he "used the mail, wrote four letters . . . asking for this to be done, for the murders of my mom and dad -- stepdad."  (Change-

of-Plea Transcript at 23-25).  When this court asked why he had been interested in murdering his

mother and stepfather, Silicani answered:

> Your Honor, I at the time -- I mean, it was for the life insurance policy, Your Honor.
> Um, I -- sorry. I'm not good at talking. Your Honor, it was for that. Obviously it
> was, you know, big error in judgment obviously. And, you know, I'd take it back
> if I could, you know.

(Change-of-Plea Transcript at 24).  This court accepted Silicani's guilty pleas.  (Change-of-Plea

Transcript at 26).

The assigned probation officer filed the final Presentence Investigation Report (PSR) on

June 23, 2015, including a calculation of the advisory Sentencing Guidelines.  (ECF No. 49 at 1,

9-10).  Beginning at base offense level 37, Silicani received a two-point upward adjustment

because the offense involved multiple counts and two intended victims, then a three-level

reduction for his timely acceptance of responsibility, resulting in a total offense level of 36.  (ECF

No. 49 at 8-10).  Because he was in criminal history category III, his advisory guideline range was

235 to 293 months imprisonment.  (ECF No. 49 at 17).  The PSR recommended an upward variance

and a sentence of 432 months.  (ECF No. 49 at 19-20).

Sentencing occurred on July 9, 2015.  (Sentencing Transcript at 1).  Neither party objected

to the PSR or this court's recitation of the Guidelines calculation.  (Sentencing Transcript at 4, 6-

7).  The United States advocated for a forty-year, statutory-maximum sentence.  (Sentencing

Transcript at 10-13).  Silicani's attorney advocated for a 240-month sentence, citing Silicani's

mental health issues, characterizing a forty-year sentence as "simply punitive," and giving

examples of other cases from the District of Wyoming that resulted in lower sentences.

(Sentencing Transcript at 8-9, 13-21).  Silicani's mother talked about loving and forgiving her son,

as well as the victims' fear that Silicani would "be released during [their] lifetimes and [would]

again make an attempt on [their] lives."  (*Id.* at 21, 23-24).  Ultimately, this court varied upward

and imposed an aggregate sentence of 420 months: three consecutive 120-month sentences on Counts One through Three, followed by a consecutive sixty-month sentence on Count Four. (Sentencing Transcript at 29-30; ECF No. 54 at 2).

Silicani appealed his sentence on two grounds. *See United States v. Silicani*, 650 F. App'x 633, 634 (10th Cir. 2016). First, he argued this court should have "sua sponte order[ed] a hearing under 18 U.S.C. § 4244 to assess whether he should have been hospitalized rather than imprisoned. Second, he argue[d] that his above-guidelines sentence was substantively unreasonable." *Id.* The Tenth Circuit rejected Silicani's arguments and affirmed this court's judgement. *Id.* at 634, 636-37, 639.

Silicani petitioned the Supreme Court for a writ of certiori, which the Court denied on November 28, 2016. *See Silicani v. United States*, 137 S. Ct. 531 (2016). At that point, Silicani's convictions became final. *See, e.g.*, *United States v. Prows*, 448 F.3d 1223, 1227 (10th Cir. 2006).

On November 24, 2017, Silicani timely filed his motion under § 2255, instituting the present proceeding. (17-CV-197, ECF No. 1). Three days later, on November 27, Silicani filed a supplement to his motion. (17-CV-197, ECF No. 2).

## DISCUSSION

### I.      Analytical Framework

Under 28 U.S.C. § 2255(a), a federal prisoner "claiming . . . [his] sentence was imposed in violation of the Constitution or laws of the United States" may collaterally attack that sentence by filing a motion in the sentencing court. However, in presenting his § 2255 motion, a defendant must overcome specific procedural obstacles.

First, a defendant who pled guilty without a conditional plea agreement must overcome the preclusive effect of his pleas. The government has a substantial interest in the finality of guilty

pleas, and generally, pleading guilty precludes a defendant from subsequently challenging his conviction(s) in a direct appeal or collateral attack. *See, e.g.*, *United States v. Broce*, 488 U.S. 563, 569, 576 (1989); *United States v. Berres*, 777 F.3d 1083, 1085-86, 1090-91 (10th Cir. 2015). There are several exceptions to this general rule, however. These exceptions permit a defendant to challenge the voluntariness of his pleas, his attorney's effectiveness in connection with the pleas, the court's subject-matter jurisdiction, or the government's power to prosecute him. *See Class v. United States*, 138 S. Ct. 798, 803-05 (2018); *Broce*, 488 U.S. at 569, 574-75; *United States v. De Vaughn*, 694 F.3d 1141, 1153 (10th Cir. 2012), *overruled on other grounds by Class*, 138 S. Ct. at 803. As pertinent here, pleading guilty to multiple violations of the same statute does not preclude a defendant from subsequently claiming his conduct constituted only one violation of that statute, so long as the issue was apparent when the defendant entered his guilty pleas. *See Thomas v. Kerby*, 44 F.3d 884, 888-89 (10th Cir. 1995).

However, apart from the generally preclusive effect of guilty pleas, a defendant's claims in a § 2255 motion are subject to a second procedural obstacle: the procedural bar rule governing collateral attacks. *See Brown v. United States*, 34 F.3d 990, 990-91 (10th Cir. 1994). Under this rule, a defendant may not use a § 2255 motion to raise issues that could have been resolved before this court in the first instance or on direct appeal. *United States v. Frady*, 456 U.S. 152, 167-68 (1982); *United States v. Challoner*, 583 F.3d 745, 748-49 (10th Cir. 2009); *United States v. Cook*, 997 F.2d 1312, 1320 (10th Cir. 1993). Where the government raises the procedural bar in response to a defendant's § 2255 motion, the court is obliged to address the issue and, if appropriate, dispose of the case on that basis. *United States v. Allen*, 16 F.3d 377, 378 (10th Cir. 1994).

To overcome the procedural bar, a defendant must "first demonstrate either cause and actual prejudice, or that he is actually innocent." *Challoner*, 583 F.3d at 749. A defendant may

establish "cause" in various ways. Ordinarily, a defendant must show that some external impediment prevented his attorney from developing or raising the claim in question. *Murray v. Carrier*, 477 U.S. 478, 492 (1986). A defendant might show "cause" by demonstrating his non-compliance was the product of some kind of governmental or official interference, or that his claim was so novel that its legal basis was not reasonably available to his attorney. *Id.* at 488; *see also Reed v. Ross*, 468 U.S. 1, 16 (1984). Alternatively, a motion under § 2255 is the proper avenue for a defendant to raise claims that he received ineffective assistance of counsel. *See United States v. Galloway*, 56 F.3d 1239, 1240 (10th Cir. 1995) (en banc). And "[a] meritorious claim of ineffective assistance of counsel constitutes cause and prejudice for purposes of surmounting the procedural bar." *United States v. Harms*, 371 F.3d 1208, 1211 (10th Cir. 2004).

To establish ineffective assistance of counsel, a defendant must satisfy the familiar requirements of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Specifically, he "must show both that his counsel's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for the counsel's error, the result of the proceeding would have been different." *Challoner*, 583 F.3d at 749 (quoting *Strickland*, 466 U.S. at 688, 694) (quotation marks omitted). A defendant claiming ineffective assistance of counsel must do more than simply offer conclusory allegations; he must make particularized and specific factual averments that, if proven, would demonstrate both the ineffectiveness of his attorney's performance and the resulting prejudice to his case. *See Hatch v. Oklahoma*, 58 F.3d 1447, 1457 (10th Cir. 1995), *overruled on other grounds by Daniels v. United States*, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001); *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994). This requirement must be satisfied even where, as here, the defendant is proceeding *pro se*, and notwithstanding the usual rule that *pro se* pleadings are to be liberally construed. *See Fisher*, 38 F.3d at 1147.

## II.    Unit-of-Prosecution Issue

In this case, Silicani's first issue implicates the appropriate unit of prosecution under the murder-for-hire statute, 18 U.S.C. § 1958.  A statute's unit of prosecution governs whether a defendant's "conduct constitutes one or several violations of" that statute.  *Callanan v. United States*, 364 U.S. 587, 597 (1961).  Also called "multiplicity," a unit-of-prosecution violation occurs when the government charges a defendant with multiple counts for a single statutory violation.  *See id.*; *United States v. Johnson*, 130 F.3d 1420, 1424 (10th Cir. 1997).  Here, Silicani argues his conduct constituted only a single violation of § 1958, and therefore, his statutory-maximum sentence should have been 120 months.  (17-CV-197, ECF No. 1 at 4-5, ECF No. 2 at 2-3).  In a similar vein, he argues his four counts should have grouped together under §3D1.2 of the Sentencing Guidelines.  (17-CV-197, ECF No. 1 at 4-5).  As an explanation for failing to raise these arguments on direct appeal, Silicani claims he received ineffective assistance of counsel.  (17-CV-197, ECF No. 1 at 4).

### a.    Because Silicani's unit-of-prosecution claim is procedurally barred, this court should analyze that claim under the *Strickland* framework, rather than considering its merits.

In considering Silicani's unit-of-prosecution claim, this court should apply the *Strickland* framework outlined above.  Admittedly, Silicani's guilty pleas do not preclude his claim, because the issue was clear on the existing record when he pled guilty.  *Cf. Kerby*, 44 F.3d at 886-89.  Nevertheless, because Silicani did not raise the claim on direct appeal, the procedural bar applies.  *See Challoner*, 583 F.3d at 748-49; *Brown*, 34 F.3d at 990-91.  And because Silicani is not claiming he is actually innocent,[3] or that some external impediment prevented his attorneys from raising the

---

[3] Such a claim would be meritless in any event.  For purposes of overcoming the procedural bar, "actual innocence" means factual innocence, not legal innocence.  *See Selsor v. Kaiser*, 22

claim earlier, he can only overcome the procedural bar if he demonstrates his attorneys were constitutionally ineffective under *Strickland*.  *See Murray*, 477 U.S. at 488, 492; *Challoner*, 583 F.3d at 749.

Silicani does not address the procedural bar directly, but in the supplement to his § 2255 motion, he implicitly invites this court to resolve his claim on the merits instead of applying *Strickland*.  (17-CV-197, ECF No. 2 at 2-3).  Specifically, citing the Tenth Circuit's decision in *United States v. Long*, 787 F.2d 538, 538-39 (10th Cir. 1986) ("*Long II*"), Silicani argues, "it is permissible to bring a collateral challenge to the unit of prosecution for the first time in a § 2255 petition."  (17-CV-197, ECF No. 2 at 2).

In Long's case, a jury convicted him on nine counts of possessing stolen mail under 18 U.S.C. § 1708.  *United States v. Long*, 705 F.2d 1259, 1260 (10th Cir. 1983) ("*Long I*").  Long raised various claims on direct appeal, but he did not bring a unit-of-prosecution challenge.  *See Long I*, 705 F.2d at 1260-63.  Subsequently, in a § 2255 motion, Long argued his underlying acts constituted only a single violation of § 1708.  *Long II*, 787 F.2d at 538.  "The district court denied the motion without a hearing or response from the Government, ruling that Long's contention should have been raised in his direct appeal."  *Id.*  The Tenth Circuit disagreed, noting § 2255 "specifically allows a motion asserting that 'the sentence was in excess of the maximum authorized by law,'" and observing it and other courts "have allowed such a collateral challenge to the unit of prosecution."  *Id.* at 538-39.  The Tenth Circuit then considered the merits of Long's claim, ultimately remanding the case for additional fact-finding.  *See id.* at 539-40.

---

F.3d 1029, 1034-36 (10th Cir. 1994).  Thus, even a double jeopardy violation is not sufficient to establish "actual innocence."  *See id.* at 1036.

Relying on *Long II*, Silicani may be arguing the procedural bar does not apply to unit-of-prosecution claims.  (17-CV-197, ECF No. 2 at 2).  This court should reject any such argument, however, for at least three reasons.

First, basic principles of *stare decisis* limit *Long II*'s precedential value.  "In order for a decision to be given stare decisis effect with respect to a particular issue, that issue must have been actually decided by the court."  *United Food & Commercial Workers Union, Local 1564 of New Mexico v. Albertson's, Inc.*, 207 F.3d 1193, 1200 (10th Cir. 2000).  "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."  *United States v. Romero*, 491 F.3d 1173, 1177 (10th Cir. 2007).  Even where a prior case rests on an implicit assumption, that assumption is not precedential if it was "neither placed directly at issue by the parties . . . nor explicitly decided by the panel."  *See United States v. Crowe*, 735 F.3d 1229, 1240 (10th Cir. 2013).  For instance, if a prior decision reached the merits of an argument without acknowledging an applicable jurisdictional bar, that decision should not be read as implying jurisdiction actually existed.  *See Tejeda-Acosta v. Holder*, 506 F. App'x 785, 788 n.5 (10th Cir. 2012).

Under these principles, *Long II* cannot exempt unit-of-prosecution claims from the procedural bar.  In *Long II*, the Tenth Circuit merely indicated it "disagree[d] with the district court's determination that the issue of impermissible multiple counts cannot be raised for the first time in a motion under section 2255."  787 F.2d at 538.  Admittedly, this disagreement <u>might</u> relate to the procedural bar, because the district court <u>might</u> have invoked the bar *sua sponte*.[4]  But

---

[4] As a general matter, a district court may invoke the procedural bar *sua sponte* "if doing so furthers the interests of judicial efficiency, conservation of scarce judicial resources, and orderly and prompt administration of justice."  *Allen*, 16 F.3d at 378-79 (quotation marks omitted).  However, when a district court invokes the procedural bar *sua sponte*, it must afford the defendant an opportunity to respond and overcome the bar by showing cause and prejudice or a fundamental

because the Tenth Circuit did not elucidate the district court's legal reasoning, its basis for disagreement is unclear.  *See id.* at 538-39.  And whatever its reason for disagreeing, the Tenth Circuit neither discussed, analyzed, nor even acknowledged the procedural bar.  *See id.*  Nor did the Tenth Circuit cite or distinguish Supreme Court procedural-bar case law.  *See id.*[5]  Thus, because *Long II* neither analyzed nor even acknowledged the procedural bar, it should not be read as exempting unit-of-prosecution claims from the bar.  *Cf. Tejeda-Acosta*, 506 F. App'x at 788 n.5.

Second, the Tenth Circuit's later decision in *Brown v. United States* indicates *Long II* does not exempt unit-of-prosecution claims from the procedural bar.  In *Brown*, after neglecting to raise the claim on direct appeal, the defendant filed a § 2255 motion claiming his two bank-robbery "counts should have merged for sentencing because the convictions were based upon a single criminal episode."  34 F.3d at 991.  The government invoked the procedural bar, and the district court accordingly denied Brown's § 2255 motion on the magistrate judge's recommendation.  *See id.* at 990-91.  On appeal, citing *Long II* and a Second Circuit case, the Tenth Circuit construed

---

miscarriage of justice.  *See United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994).  In *Long II*, the district court apparently denied Long's motion without giving him an opportunity to respond.  *See* 787 F.2d at 538.  As one possible explanation, the district court might have invoked the procedural bar *sua sponte* and simply overlooked Long's right to respond.  But as another possible explanation, the district court might have believed – incorrectly – that Long's failure to challenge the statute's unit of prosecution on direct appeal <u>absolutely</u> prohibited him from doing so in his § 2255 motion, irrespective of whether he could show cause and prejudice or a miscarriage of justice in his response.  Thus, it is unclear whether the procedural bar was at issue in *Long II*.

[5] The Supreme Court issued *United States v. Frady*, its seminal procedural-bar case, in 1982.  *See* 456 U.S. at 167-68.  The Tenth Circuit decided *Long II* in 1986, but it did not cite *Frady*.  *See* 787 F.2d at 538-39.  Rather, the Tenth Circuit cited its own decision in *United States v. LeMon*, 622 F.2d 1022 (10th Cir. 1980) and the Fifth Circuit's decision in *Williams v. United States*, 385 F.2d 46 (5th Cir. 1967).  *Long II*, 787 F.2d at 539.  Neither of these cases discussed the procedural bar, and both predated *Frady*.  *See Williams*, 385 F.2d at 46-47; *LeMon*, 622 F.2d at 1023-25.

"Brown's motion as raising significant double jeopardy concerns and therefore cognizable under § 2255." *Id.* at 991.  The Tenth Circuit also noted the magistrate judge's determination that Brown's claim was procedurally barred.  *Id.* at 991.  The government waived the procedural bar on appeal, so the Tenth Circuit remanded for resentencing.  *See id.* at 990-91.  But the Tenth Circuit admonished that "[i]n so doing, we do not modify the principle that if the government properly raises and pursues a procedural bar defense, it is entitled to a ruling on that defense."  *Id.* at 991.  This admonishment in *Brown* belies the suggestion that *Long II* exempts unit-of-prosecution claims from the procedural bar.[6]

Third, the Tenth Circuit has repeatedly applied the procedural bar in unit-of-prosecution and double jeopardy decisions issued after *Long II*, further belying any argument that *Long II* exempts such claims from the bar.  *See United States v. Fillman*, 410 F. App'x 173, 175 (10th Cir. 2011) (applying the procedural bar to the defendant's claim that his various convictions for possessing unregistered firearms and being a felon in possession were multiplicitous); *Challoner*, 583 F.3d at 748-50 (applying the procedural bar to a double jeopardy claim under 18 U.S.C. §§ 844(h) and 924(c)); *United States v. Hahn*, 191 F. App'x 758, 759-61 (10th Cir. 2006) (analyzing a unit-of-prosecution claim under 18 U.S.C. § 924(c) as procedurally barred, either because it was resolved on direct appeal, or because the defendant failed to raise it on direct appeal); *United States v. Kunzman*, 125 F.3d 1363, 1365-66 (10th Cir. 1997) (applying the

---

[6] In an earlier case, a magistrate judge's recommendation suggested *Long II* was precedential in the procedural bar context but distinguished *Long II* with minimal analysis. *See Gottschalk v. United States*, No. 91-4211, 1992 WL 75200, at *2 (10th Cir. April 13, 1992). Ultimately, in an unpublished opinion, the Tenth Circuit affirmed "substantially on the grounds and for the reasons" set forth in the magistrate judge's recommendation and the district court's subsequent order. *See id.* at *1. However, the Tenth Circuit did not discuss *Long II. See id.*

*Strickland* framework where the defendant did not raise her double-jeopardy claim on direct appeal), *superseded on other grounds by Slack v. McDaniel*, 120 S. Ct. 1595, 1600 (2000); *United States v. Cox*, 83 F.3d 336, 341 (10th Cir. 1996) (applying the procedural bar where the defendant failed to raise his double-jeopardy claim on direct appeal).  These cases strongly indicate *Long II* does not exempt unit-of-prosecution issues from the procedural bar.

For these reasons, to the extent Silicani is relying on *Long II* to avoid the procedural bar, this court should reject his overture.  Rather, this court must analyze his procedurally barred claim under the *Strickland* framework.

**b.  Analytical Roadmap**

Silicani devotes minimal attention to his ineffective-assistance claim, so its scope is unclear.  Construing his pleadings liberally, however, he may be arguing that both his district court and appellate attorneys should have raised the unit-of-prosecution issue.  For ease of analysis, the United States will discuss the issue in detail vis-à-vis Silicani's district court attorney.  A brief discussion of appellate counsel's effectiveness will follow.

Under *Strickland*'s two-part framework, a court may consider the "performance" and "prejudice" prongs in either order.  *United States v. Clark*, 650 F. App'x 569, 571 (10th Cir. 2016).  If a defendant fails to make a sufficient showing on one prong, then the court need not consider the other.  *Id.*  Here, as the succeeding discussion should demonstrate, Silicani's argument on the "prejudice" prong is stronger than his argument on the "performance" prong.  Ultimately, therefore, the United States will urge this court to deny Silicani's § 2255 motion on the "performance" prong.  However, to provide context, the United States will address the "prejudice" prong first.

**c. Under *Strickland*'s "prejudice" prong, Silicani has not shown a reasonable probability that the result of his sentencing would have been different if his attorney had raised a unit-of-prosecution issue.**

To satisfy *Strickland*'s "prejudice" prong, "[a] defendant must show . . . there is a reasonable probability that, but for the counsel's error, the result of the proceeding would have been different." *Challoner*, 583 F.3d at 749 (quoting *Strickland*, 466 U.S. at 688, 694) (quotation marks omitted).

> When, as here, the basis for the ineffective assistance claim is the failure to raise an issue, [a court] must look to the merits of the omitted issue. If the omitted issue is without merit, then counsel's failure to raise it is not prejudicial, and thus is not ineffective assistance.

*United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006) (citation omitted).

Here, Silicani is apparently arguing the result of his sentencing would have been different if his attorney had challenged § 1958's unit of prosecution.  As support for his argument, Silicani cites §3D1.2 of the Sentencing Guidelines, two Sixth Circuit decisions, and a recent First Circuit decision.  (17-CV-197, ECF No. 1 at 4-5; ECF No. 2 at 2).  Silicani is apparently arguing this court would have accepted a unit-of-prosecution argument under the reasoning of these authorities, merged his four counts into one, and imposed a sentence of no greater than 120 months under § 1958(a).

This court should reject Silicani's argument.  Although some case law supports Silicani's position, the overall landscape of pertinent authority indicates the United States properly charged Silicani with four separate counts under § 1958(a).  Thus, Silicani suffered no prejudice from his lawyer's silence on the issue.

i. **Under the Tenth Circuit's analytical framework for unit-of-prosecution issues, each independent use of interstate facilities in furtherance of a murder-for-hire scheme may be charged as a separate count under 18 U.S.C. § 1958(a).**

The Tenth Circuit has not considered the appropriate unit of prosecution under § 1958(a), but its cases have established a general framework for analyzing unit-of-prosecution issues. Ultimately, a court must determine what Congress intended. *See, e.g.*, *United States v. Valentine*, 706 F.2d 282, 293 (10th Cir. 1983). Tenth Circuit unit-of-prosecution cases have emphasized two interrelated considerations.[7]

First, "[t]he inquiry as to what constitutes the correct unit of prosecution focuses in part on the identification of the key element of the federal offense." *United States v. Esch*, 832 F.2d 531, 541 (10th Cir. 1987). Thus, simultaneously transporting multiple women across state lines for "immoral purposes" is a single violation, because "[u]nlawful transportation is the gist of the offense." *Robinson v. United States*, 143 F.2d 276, 276-78 (10th Cir. 1944). However, simultaneous possession of multiple unregistered firearms supports multiple charges, because "under [26 U.S.C. § 5861(d)], it is not unlawful to posses [sic] a firearm, as such; rather, the real gravamen of the offense is to possess a firearm which has not theretofore been registered." *Sanders v. United States*, 441 F.2d 412, 414 (10th Cir. 1971). Multiple mailings in furtherance of a single scheme may be charged separately, because "the gist and crux of the offense [of mail fraud] is the

---

[7] In considering a statute's unit of prosecution, a traditional *Blockburger* double-jeopardy analysis should not apply. "In *Blockburger v. United States,* the Supreme Court held that the double jeopardy clause prohibits punishing a defendant for the same conduct under *two distinct statutory provisions* unless each provision requires proof of a fact which the other does not." *United States v. Rentz*, 777 F.3d 1105, 1108 (10th Cir. 2015) (en banc) (quotation marks omitted). Admittedly, the Tenth Circuit has sometimes applied *Blockburger* in the unit-of-prosecution context. *See, e.g.*, *United States v. Jordan*, 890 F.2d 247, 249, 251-52 (10th Cir. 1989). But as the *en banc* court recently indicated, the propriety of multiple charges under a single statutory provision does not appear to implicate *Blockburger*. *See Rentz*, 777 F.3d at 1108.

use of the mails in the execution of the scheme." *Mitchell v. United States*, 142 F.2d 480, 480-81 (10th Cir. 1944). Similarly, multiple photographs during a single photographing session support multiple production-of-child-pornography counts, because "[e]ach photograph depend[s] upon a separate and distinct use of the children." *Esch*, 832 F.2d at 541-42. And multiple phone calls furthering an ongoing bookmaking scheme may be charged as separate Travel Act violations, because "[t]he continuing unlawful activity is part of the required elements, but the key element for the federal offense is the act of travel or use of interstate facilities." *United States v. Vilano*, 529 F.2d 1046, 1049-50, 1052, 1061 (10th Cir. 1976) (quotation marks omitted).

Second, as illustrated by the Tenth Circuit's 2015 *en banc* decision in *Rentz*, 777 F.3d 1105, a court should determine a statute's unit of prosecution by employing a textual analysis focused primarily on the statute's verbs. In *Rentz*, the defendant fired a single shot, killing one victim and injuring another. *Id.* at 1107. On appeal, the *en banc* court considered whether Rentz could be charged with two violations of 18 U.S.C. § 924(c)(1)(A) on the theory that he "used" a firearm "during and in relation to" two separate "crimes of violence." *See id.*[8]

The Tenth Circuit began with a fundamental premise: "When seeking a statute's unit of prosecution—when asking what the minimum amount of activity a defendant must undertake, what he must do, to commit each new and independent violation of a criminal statute—the feature that naturally draws our immediate attention is the statute's verb." *Id.* at 1109. The Tenth Circuit reasoned, "the verb supplies the action or doing part of most any sentence, statutory or otherwise."

---

[8] In pertinent part, § 924(c)(1)(A) provides, "[A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses . . . a firearm, . . . shall" be guilty of an additional offense. Prior Tenth Circuit cases had already established "that for each separate § 924(c)(1)(A) charge it pursues the government must prove a separate crime of violence or drug trafficking crime." *Rentz*, 777 F.3d at 1107 & n.1.

*Id.* The court further reasoned that, "in § 924(c)(1)(A), [it found] three relevant verbs: uses, carries, and possesses. This alone supplies some evidence that each § 924(c)(1)(A) charge must involve an independent act of using, carrying, or possessing." *Id.*

The court then considered the effect of the statute's adverbial prepositional phrases – "during and in relation to any crime of violence or drug trafficking crime" and "in furtherance of any such crime." *Id.* The court reasoned these phrases modify the verbs and "tell us *which* acts of using, carrying, or possessing Congress sough to punish—explaining that the statute doesn't seek to make illegal all such acts, only the narrower subset the phrases specify." *Id.* Considering the verbs and adverbial prepositional phrases together, the court concluded they "suggest[ed] that each § 924(c)(1)(A) charge must involve *both* an act of using, carrying, or possessing *and* that such an act must come during and relation to (or in furtherance of) a qualifying crime." *Id.* at 1109-10. After considering the statute's penalty structure, rejecting the government's arguments, and noting the rule of lenity, the court ultimately held, "a second or successive § 924(c)(1)(A) charge" must be supported by "a unique and independent use, carry, or possession." *See id.* at 1111-15.[9]

These cases suggest an overall analytical framework. In seeking a statute's unit of prosecution, a court should identify the "key element" of the offense. *Esch*, 832 F.2d at 541. In this regard, a statute's verbs usually indicate the independent acts required for separate violations

---

[9] Regarding the rule of lenity, "the simple existence of some statutory ambiguity is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree. Instead, to invoke the rule, [a court] must conclude that there is a grievous ambiguity or uncertainty in the statute." *United States v. Black*, 773 F.3d 1113, 1117 (10th Cir. 2014) (quotation marks, citation, and original brackets, and ellipsis omitted). In the present case, because the language of § 1958(a) supports a use-based unit of prosecution under the Tenth Circuit's analytical framework, the rule of lenity should not apply.

of the statute.  *See Rentz*, 777 F.3d at 1109-11; *but see Sanders*, 441 F.2d at 414-15 (holding simultaneous possession of multiple unregistered firearms supports multiple charges).  A statute's adverbial prepositional phrases limit those verbs, distinguishing offense conduct from non-offense conduct.  *See id.*  Without attempting a comprehensive survey of the Tenth Circuit's unit-of-prosecution jurisprudence, its holdings appear to be substantially consistent with the outcomes suggested by this framework.  Generally, if a defendant's conduct satisfies a statute's key element multiple times, then multiple charges are permissible.[10]  By contrast, if a defendant's conduct satisfies the key element only once, then only one charge is permissible.[11]

---

[10] *See United States v. Wall*, 37 F.3d 1443, 1446-47 (10th Cir. 1994) (holding each separate execution of a scheme to defraud a single bank could be charged separately); *Jordan*, 890 F.2d at 249, 251-52 (affirming the defendant's convictions on four false-statement counts where he used the same fraudulent tax return to secure four separate loans); *Esch*, 832 F.2d at 541-42; *LeMon*, 622 F.2d at 1023-24 (holding simultaneously printing four $100 bills could be prosecuted as four separate counts of counterfeiting, because the statute was designed to protect "each item of the United States monetary system," and "[o]ne act of counterfeiting cannot be included within another act of counterfeiting"); *Vilano*, 529 F.2d at 1061-62; *King v. United States*, 372 F.2d 946, 947-48 (10th Cir. 1967) (per curiam) (affirming a three-count conviction for transporting falsely made securities, where the defendant presented "falsely made" checks at stores in three different Utah towns, and the checks were later mailed to a bank in Arizona and received at about the same time); *Robinson v. United States*, 366 F.2d 575, 576-77, 579 (10th Cir. 1966) (upholding three separate drug-misbranding counts, because the defendant's conduct involved three separate sales, albeit occurring "at the same place and . . . very close in point of time"); *Mitchell*, 142 F.2d at 480-81.

[11] *See Rentz*, 777 F.3d at 1106-15; *United States v. Jackson*, 736 F.3d 953, 955-57 (10th Cir. 2013) (holding 18 U.S.C. § 2113(e), which prohibits killing "any person" during an attempt to avoid apprehension for bank robbery, was too ambiguous to permit multiple counts for a defendant who simultaneously killed two women in a traffic accident); *United States v. Dashney*, 937 F.2d 532, 540-42 (10th Cir. 1991) (holding separate structuring counts could not be charged based on the same underlying "cash hoard" and relying on a Seventh Circuit case explaining the statute prohibited structuring a transaction – the underlying hoard – not making deposits); *Long II*, 787 F.2d at 538-39 (applying the rule of lenity and holding "that in the absence of a showing of separate receipt or separate storage of the items, simultaneous possession of several pieces of stolen mail constitutes only one [possession of stolen mail] offense"); *Valentine*, 706 F.2d at 294 ("The simultaneous receipt of more than one weapon constitutes only one offense under 18 U.S.C. § 922(h)."); *Robinson*, 143 F.2d at 276-78.

So what is the "key element" of the murder-for-hire statute?  In pertinent part, § 1958(a) applies to

> [w]hoever *travels* in . . . interstate or foreign commerce, or *uses* . . . the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value.

(emphasis added).  The statute's verbs – "travels" and "uses" – indicate the independent acts required for separate violations.  *Cf. Rentz*, 777 F.3d at 1109-11.  The statute's adverbial prepositional phrase – "with intent that a murder be committed . . ." – limits those verbs, distinguishing offense conduct from non-offense conduct.  *Cf. Rentz*, 777 F.3d at 1109-11.  *See also United States v. Duke*, No. 99-8068, 2000 WL 913046, at *3 n.6 (10th Cir. July 7, 2000) (unpublished) ("The gravamen of § 1958 is not the mere use of interstate facilities, it is such use coupled with the intent that a murder-for-hire be committed.").  Thus, interstate travel or the use of interstate facilities is the statute's "key element," and each independent act of travel or use should be chargeable as a separate violation of § 1958(a), so long as that act was undertaken with the requisite criminal intent.

In this regard, the Tenth Circuit's decision in *Vilano* is instructive.  *Vilano* involved a unit-of-prosecution inquiry under the Travel Act, 18 U.S.C. § 1952, which prohibits interstate travel or the use of interstate facilities in aid of racketeering.  *See* 529 F.2d at 1049, 1052.  The Tenth Circuit reasoned,

> The offense defined is an act of travel or use of an interstate facility, with the requisite intent, plus subsequent performance of another act of the kind specified in the statute. The continuing unlawful activity is part of the required elements, but the key element for the federal offense is the act of travel or use of interstate facilities.

*Id.* at 1061 (quotation marks omitted).  Similarly, under § 1958(a), a murder-for-hire plot is part of the required elements, but the key element is interstate travel or use of an interstate facility. Thus, each act of travel or use may be charged separately.

Here, Silicani sent four letters in furtherance of his murder-for-hire scheme.  He thereby engaged in "a series of steps, following one after the other, each of which constituted in itself a complete offense."  *Cf. Robinson*, 143 F.2d at 278 & n.8.  Thus, the United States properly charged him with four separate violations of § 1958(a).

### ii.   Despite conflicting decisions, Sixth Circuit authority supports charging multiple counts under § 1958(a) based on multiple uses of interstate facilities.

Arguing to the contrary in his § 2255 motion, Silicani relies on §3D1.2 of the Sentencing Guidelines and two related Sixth Circuit decisions.  (17-CV-197, ECF No. 1 at 4-10).  Under the Guidelines, §3D1.2(b) directs a sentencing court to group multiple counts that "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan."  In *United States v. Wilson*, 920 F.2d 1290, 1293-94 (6th Cir. 1990), the Sixth Circuit held multiple § 1958 counts involving a single plot and a single intended victim should group together under §3D1.2(b).  Three years later, in *United States v. Wynn*, the Sixth Circuit held that, just as separate violations of § 1958 involving a single intended victim should group under the Guidelines, "[s]o too, separate phone calls which relate to one plan to murder one individual constitute only one violation of . . . § 1958."  987 F.2d 354, 359 (6th Cir. 1993).  *Wynn* did not analyze the language of § 1958(a) but simply rested on the "logic" of *Wilson*. *See id.* at 358-59.

These authorities do not support Silicani's unit-of-prosecution argument.  The Guidelines' grouping rules govern the treatment of multiple counts under the Guidelines, not whether multiple

counts are proper under a particular statute. *See, e.g.*, USSG Ch.3, Pt.D, intro. comment. ("In essence, counts that are grouped together are treated as constituting a single offense <u>for purposes of the guidelines.</u>" (emphasis added)). Thus, the propriety of charging a defendant with multiple counts under § 1958(a) is a separate question from whether those counts should group under §3D1.2(b). In *Wynn*, the Sixth Circuit simply overlooked or ignored this distinction, reasoning that because multiple § 1958(a) counts should group under the Guidelines, multiple § 1958(a) counts are actually improper to begin with. *See* 987 F.2d at 359. The fallacy is patent: the Guidelines' grouping rules cannot affect an underlying statute's unit of prosecution, because the Guidelines' grouping rules <u>only</u> apply if multiple counts are appropriate in the first place. Moreover, *Wynn*'s reliance on the Guidelines' grouping rules rather than the language of § 1958(a) is inconsistent with the Tenth Circuit's approach to unit-of-prosecution questions. Thus, purely on its own merits (or lack thereof), *Wynn* is not persuasive here.

Moreover, in *United States v. Ng*, 26 F. App'x 452 (6th Cir. 2001) (per curiam), the Sixth Circuit issued a decision analyzing § 1958's unit of prosecution differently. Over the course of nearly a year, Ng negotiated with a purported hit man (actually an FBI informant) to murder his lover's ex-husband. *See id.* at 455-58. A jury eventually convicted Ng of three § 1958 counts based on: (1) Ng's travel from California to Michigan, (2) the purported hit man's travel from Michigan to California on a separate occasion, and (3) Ng's using a telephone over an eight-month period. *Id.* at 455. On appeal, Ng argued his indictment was multiplicitous, reasoning "the statute is intended to punish, as a unit of prosecution, the hiring of someone to kill another person." *Id.* at 461. Because his offense involved a single agreement, Ng argued the district court should have granted his motion to consolidate the three counts. *See id.* at 460-61. The Sixth Circuit disagreed, holding:

The plain language of the statute makes clear that the evil it intended to proscribe was the interstate travel and use of facilities in interstate commerce with intent that a murder-for-hire be committed. The defendant's own travel from California to Michigan in December 1998 was a separate offense from his causing [the purported hit man] to travel from Michigan to California in June 1999, even though they were committed as part of an ongoing scheme to commit murder-for-hire. Further, the defendant's use of a facility in interstate commerce between October 1998 and June 1999 was properly charged as a separate offense.

*Id.* at 462.

*Ng* neither discussed nor cited *Wynn*, *see id.* at 455-63, but the holdings of the two cases cannot be reconciled. Admittedly, the decisions are not directly contradictory, because unlike the situation in *Wynn*, the government in *Ng* charged multiple phone calls in a single count. *Compare Wynn*, 987 F.2d at 355, 358-59, *with Ng*, 26 F. App'x at 455. But in *Wynn*, the Sixth Circuit held § 1958's unit of prosecution is defined by the number of plots to murder a single victim. *See* 987 F.2d at 358-59. *See also United States v. Gordon*, 875 F.3d 26, 35 (1st Cir. 2017) (construing *Wynn*). By contrast, the Sixth Circuit affirmed separate § 1958 counts in *Ng*, even though the case involved a single plot to murder a single victim. 26 F. App'x at 462. Thus, the two holdings are fundamentally inconsistent. *See Gordon*, 875 F.3d at 35 & n.5 (acknowledging *Ng* "takes a different view" from *Wynn*).

Of the two holdings, only *Ng*'s is persuasive here. Though unpublished, *Ng* analyzed the unit-of-prosecution issue at greater length than *Wynn*. And while *Wynn* fallaciously relied on the Guidelines' grouping rules, *Ng* reached its conclusion based on "[t]he plain language of the statute" and "the evil it intended to proscribe." *See Ng*, 26 F. App'x at 462. In this vein, *Ng*'s analysis was very similar to the Tenth Circuit's focus on the statutory language and "key element." Thus, although *Ng* and *Wynn* reached contrary results, only *Ng* is persuasive authority in this case. Its reasoning indicates the United States properly charged Silicani with four separate counts under § 1958(a).

24

### iii.   This court should decline to follow the First Circuit's decision in *United States v. Gordon*.

In the supplement to his § 2255 motion, Silicani relies on the First Circuit's 2017 decision in *United States v. Gordon*, 875 F.3d 26.  (17-CV-197, ECF No. 2 at 2).  In *Gordon*, a jury convicted the defendant of five murder-for-hire counts based on two mailings and three phone calls in a plot to murder two witnesses against him.  *See id.* at 28-29.  Gordon challenged § 1958's unit of prosecution on appeal.  *Id.* at 29.  The First Circuit agreed, holding, "the appropriate unit of prosecution under 18 U.S.C. § 1958(a) is a single plot to murder a single individual, not the number of times that the facilities of interstate commerce were used." *Id.* at 28.  In this regard, the First Circuit decided the statute's operative language did not resolve the issue.  *Id.* at 33.  However, after considering the statute's sentencing scheme and legislative history, along with other authorities and indicia of congressional intent, the First Circuit rejected the government's contrary arguments and remanded the case with instructions "to merge the five counts into a single count and resentence the defendant." *See id.* at 33-38.

Undeniably, *Gordon* supports Silicani's position in the present case.  However, this court should decline to follow it.

First, and most importantly, *Gordon*'s analysis does not comport with the Tenth Circuit's analytical approach to unit-of-prosecution issues.  In *Gordon*, the First Circuit did not analyze the verbs or other operative language of § 1958(a) in detail.  *See Gordon*, 875 F.3d at 31-33.  Nor did the First Circuit attempt to ascertain the "key element" of the offense from this language.  *See id.* In this vein, therefore, *Ng* is more persuasive than *Gordon*, because *Ng*'s analysis mirrors the Tenth Circuit's approach to unit-of-prosecution questions.  *See Ng*, 26 F. App'x at 462.

Second, *Gordon* overemphasized § 1958(a)'s sentencing scheme in its unit-of-prosecution analysis.  Admittedly, "[t]he plainness of statutory language is determined by reference to the

language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *United States v. Burkholder*, 816 F.3d 607, 614 (10th Cir. 2016) (quotation marks omitted).   In *Rentz*, for example, the Tenth Circuit cited § 924(c)(1)(C)'s graduated sentencing scheme in support of its conclusion that each separate charge under § 924(c)(1)(A) required a separate "use, carry, or possession," reasoning Congress required "a second blameworthy choice" for a subsequent conviction.  *See* 777 F.3d at 1111-12.  Therefore, in seeking § 1958(a)'s unit of prosecution, examining its sentencing scheme is appropriate.

In *Gordon*, the First Circuit concluded § 1958(a)'s sentencing scheme weighed in favor of a plot-based unit of prosecution.  *See* 875 F.3d at 33.  "The statute provides for a maximum of ten years' imprisonment for a violation that does not result in personal injury, a maximum of twenty years' imprisonment for a violation that does result in personal injury, and a maximum of death or life imprisonment if murder results."  *Gordon*, 875 F.3d at 33 (citing § 1958(a)).  The First Circuit reasoned Congress intended a defendant's punishment to be greater if a victim suffered greater harm.  *See id.*  The First Circuit further reasoned an act-based unit of prosecution "seems irrational," because for example, a person who made ten telephone calls without causing injury would face a steeper maximum sentence than a person who caused personal injury with a single call. *Id.*

Contrary to the First Circuit's conclusion, however, the statutory sentencing scheme does not undermine a use-based unit of prosecution under § 1958(a).  With little imagination, one can conceive of similarly "irrational" results under *Gordon*'s holding.  For example, a defendant who continuously plotted to have her estranged husband murdered for years, traveling numerous times and making numerous phone calls, would face the same maximum penalty under *Gordon* as a defendant who made a single phone call and changed her mind shortly thereafter.  It would not be

26

"irrational" for Congress to intend the former defendant to face a steeper maximum sentence, especially because the maximum penalty for any given use or act of travel – in either case – would be enhanced based on any harm to the victim.   At a minimum, this court should not read the sentencing scheme as contradicting the operative language of the statute itself, which supports a use-based unit of prosecution.

Third, contrary to *Gordon*'s conclusion, § 1958's legislative history does not weigh against a use-based unit of prosecution.   As a predicate matter, legislative history "may be a shaky enough claim on which to stake any statutory interpretation in the face of adverse textual evidence." *Rentz*, 777 F.3d at 1112.   In *Gordon*, acknowledging § 1958's legislative history could be read as supporting either a use- or a plot-based unit of prosecution, the First Circuit ultimately concluded it favored the latter.   *See* 875 F.3d at 33-34.   Significantly, however, one statement in the Senate Report explaining the statute's adoption indicated, "The gist of the offense is the travel in interstate commerce or the use of the facilities of interstate commerce or of the mails with the requisite intent[,] and the offense is complete whether or not the murder is carried out or even attempted." *See id.* at 34 n.4 (quoting S. REP. NO. 98-225, at 306 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3485, *available at* 1983 WL 25404, page 3 of 5).   The First Circuit dismissed this passage, claiming it "does not indicate whether multiple uses constitute serial violations of the statute." *Gordon*, 875 F.3d at 34 n.4.   But in the Tenth Circuit, where the "gist" or "key element" of a statute is a paramount consideration, this passage supports a use-based unit of prosecution.   *Cf. Esch*, 832 F.2d at 541; *Mitchell*, 142 F.2d at 481.

Fourth, although *Gordon* cited *Wynn*, the First Circuit neither analyzed *Wynn* nor adopted *Wynn*'s fallacious reasoning.   *See Gordon*, 875 F.3d at 35.   Thus, *Gordon*'s reliance on *Wynn* does nothing to bolster the persuasive value of either decision.

Fifth, the First Circuit overstated the supposed "arbitrary relationship" between a defendant's conduct and statutory-maximum penalty under a use-based unit of prosecution. *See Gordon*, 875 F.3d at 35 & n.6. According to the First Circuit, the "arbitrary relationship" could arise because, for example, a hit man repeatedly using interstate facilities without the defendant's knowledge could subject the defendant to additional counts without any additional conduct on his own part. *See id.* at 35. The First Circuit reasoned this "would be particularly problematic in cases, like this one, in which the government uses an undercover agent who, by controlling contact with a defendant, can easily manipulate the number of chargeable counts." *Id.* at 35 n.6. However, because § 1958(a) does not impose a mandatory-minimum sentence unless death results, a district court normally retains its discretion to impose a lenient sentence, however many counts the government may charge. The Sentencing Guidelines act as an additional check on the government's ability to enhance a defendant's sentence by charging multiple counts. *See, e.g.*, *United States v. Armenta-Castro*, 227 F.3d 1255, 1259 n.4 (10th Cir. 2000). And if a defendant believes the government improperly manipulated the investigation to charge him with additional counts, he could seek a downward variance under § 3553(a) or a downward departure under a theory of "outrageous governmental conduct." *See United States v. Beltran*, 571 F.3d 1013, 1017-20 & n.1 (10th Cir. 2009). These considerations mitigate any concern about an "arbitrary relationship" between conduct and sentencing liability under a use-based unit of prosecution.

One other aspect of *Gordon* merits attention: its analysis of the relationship between §§ 1958(a) (the murder-for-hire statute) and 1952 (the Travel Act). In *Gordon*, the government argued that because the Travel Act was the model for the murder-for-hire statute, and because the Travel Act punishes each act of travel or use of an interstate facility separately, the murder-for-hire statute should have the same unit of prosecution. *See* 875 F.3d at 36. The United States has

raised this same argument here (discussed above).   The First Circuit disagreed in *Gordon*, distinguishing the Travel Act on the basis that it requires a defendant to perform or attempt another prohibited activity <u>after</u> traveling or using an interstate facility, whereas the murder-for-hire statute contains no such requirement.  *See id.*

This court should reject this analysis.  Although the First Circuit correctly identified a textual distinction between the two statutes, it is a distinction without a difference, especially in the Tenth Circuit.  As discussed above, the Tenth Circuit permits multiple Travel Act charges for multiple uses of interstate facilities in furtherance of the same unlawful scheme.  *See Vilano*, 529 F.2d at 1049-50, 1052, 1061.  And when the Tenth Circuit considered the Travel Act's unit of prosecution, it did not rely on the subsequent-prohibited-act requirement.  *See id.* at 1061.  Rather, the Tenth Circuit held, "the key element for the federal offense is the act of travel or use of interstate facilities."  *See id.* at 1061.  This holding should apply with equal force under the murder-for-hire statute.

In sum, although *Gordon* considered § 1958(a)'s unit of prosecution thoughtfully and at length, its reasoning is ultimately unpersuasive.  Therefore, this court should decline to follow *Gordon*.

### iv.   Conclusion

For all these reasons, Silicani has failed to demonstrate that his unit-of-prosecution argument has merit.  Thus, he cannot show a reasonable probability that this court would have imposed a lesser sentence if his attorney had raised the issue.  He has therefore failed to satisfy *Strickland*'s "prejudice" prong.  *See Challoner*, 583 F.3d at 749.

**d.   Under *Strickland*'s "performance" prong, Silicani has not shown his defense attorney was objectively unreasonable for failing to challenge the applicable unit of prosecution or Guidelines calculation in this court.**

Despite the foregoing discussion under *Strickland*'s "prejudice" prong, this court need not determine the appropriate unit of prosecution under § 1958(a). Whatever its merits today, Silicani cannot show his attorney was deficient for failing to raise a unit-of-prosecution challenge at the time. Thus, Silicani cannot satisfy *Strickland*'s "performance" prong, and this court should deny his § 2255 motion on that basis.

To satisfy *Strickland*'s "performance" prong, a defendant "must demonstrate that his attorney's performance was deficient and fell below an objective standard of reasonableness." *Bullock v. Carver*, 297 F.3d 1036, 1044 (10th Cir. 2002) (quoting *Strickland*, 466 U.S. at 687-88) (quotation marks omitted). The Sixth Amendment does not require an attorney to be perfect, only that she provide reasonably effective assistance. *See United States v. Haddock*, 12 F.3d 950, 955-56 (10th Cir. 1993); *Gillette v. Tansy*, 17 F.3d 308, 310-11 (10th Cir. 1994). In considering an attorney's performance, a reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Bullock*, 297 F.3d at 1052 (quoting *Strickland*, 466 U.S. at 689) (quotation marks omitted). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . . There are countless ways to provide effective assistance in any given case." *Gillette*, 17 F.3d at 311 (quoting *Strickland*, 466 U.S. at 689).

These same standards apply where, as here, a defendant faults his attorney for failing to raise a legal argument. *See generally Bullock*, 297 F.3d at 1043-51. The defendant must overcome *Strickland*'s general presumption that his attorney's action or inaction was objectively reasonable as part of a legitimate strategy. *See id.* at 1047. Beyond this general presumption, an even stronger

presumption attaches to informed strategic choices, which are "virtually unchallengeable." *See id.* On the other hand, if defense counsel were unaware of a particular legal argument, these presumptions would not apply. *See id.* at 1049-50. However, the Sixth Amendment does not "require counsel to raise, or even be cognizant of, all potential defenses." *Harms*, 371 F.3d 1212. Therefore, even where an attorney overlooked a particular legal argument, "the pertinent question under the first prong of *Strickland* remains whether, after considering all the circumstances of the case, the attorney's representation was objectively reasonable." *Bullock*, 297 F.3d at 1050-51. Under this objective analysis, if a fully informed attorney reasonably could have made the same decision, a defendant cannot satisfy *Strickland*'s first prong. *See id.* at 1053-54.

In the present case, as discussed above, Silicani's ineffective-assistance claim apparently rests on §3D1.2 of the Sentencing Guidelines, the Sixth Circuit's decisions in *Wilson* and *Wynn*, and the First Circuit's decision in *Gordon*. (17-CV-197, ECF No. 1 at 4-10; ECF No. 2 at 2). None of these authorities satisfies *Strickland*'s "performance" prong.

### i. Because this court properly grouped Silicani's multiple § 1958 counts under USSG §3D1.2(b), Silicani's defense attorney was not deficient for declining to object.

As a predicate matter, although he raises §3D1.2(b) in the context of a unit-of-prosecution argument, Silicani also may be arguing his attorney should have objected to this court's application of the Guidelines' grouping rules. (*See* 17-CV-197. ECF No. 1 at 4). However, because Silicani intended two victims to be murdered, this court properly grouped his four § 1958(a) counts into two groups under §3D1.2(b), resulting in a two-level enhancement under §3D1.4(a). (*See* ECF No. 49 at 9-10, Sentencing Transcript at 4-5). The Sixth Circuit's decision in *Wilson* does not suggest a contrary result, because its murder-for-hire plot involved only one intended victim. *See* 920 F.2d at 1293-94. Rather, Silicani's case is similar to *United States v. Vasco*, 564 F.3d 12, 15-

18, 23 (1st Cir. 2009), in which the First Circuit upheld two groups for five § 1958 counts, because the defendant intended to have both his wife and daughter murdered.   In view of *Vasco* and §3D1.2(b), a reasonable attorney could have declined to challenge this court's application of the Guidelines' grouping rules.

> ii.    **Silicani's defense attorney was not deficient for failing to raise a unit-of-prosecution argument.**

> > 1.    **A reasonable attorney need not have located *Wynn*, but in any event, a fully informed attorney reasonably could have concluded *Wynn* was not persuasive and accordingly declined to raise a unit-of-prosecution challenge based on that case.**

The existing record does not reveal whether Silicani's attorney was aware of *Wynn*.   But in any event, foregoing a *Wynn*-based unit-of-prosecution challenge would have been objectively reasonable.

First, as a general matter, a decision's lack of controlling force should weigh against a finding that an attorney was deficient for failing to raise it.   *See United States v. Hendrickson*, 592 F. App'x 699, 703 (10th Cir. 2014) ("As a preliminary matter, we underscore the obvious: [a Sixth-Circuit decision] is not a product of our court; therefore, it would not have been a controlling fixture of the legal landscape surveyed by Hendrickson's counsel and the district court at the time of sentencing"); *United States v. Maass*, 44 F. App'x 298, 301-02 (10th Cir. 2002) (noting "the failure of an attorney to be aware of prior <u>controlling</u> precedent . . . <u>might</u> render counsel's assistance ineffective." (emphasis added)).   In the present case, *Wynn* is a product of the Sixth Circuit, not a controlling Tenth Circuit decision.   Ideally, of course, a defense attorney in Silicani's case would have researched unit-of-prosecution decisions from other circuits.   But *Strickland* does not require an attorney to render ideal performance.   *See United States v. Godfrey*, 183 F. App'x 419, 423 (5th Cir. 2006); *Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir. 1992) (observing

*Strickland*'s deficiency standard does not ask "what the ideal attorney might have done in a perfect world"). As a matter of reasonably effective assistance, because *Wynn* was not controlling authority, an attorney need not have located *Wynn* in Silicani's case.

But even if this court were to determine a reasonable attorney should have located *Wynn*, that attorney properly could have concluded *Wynn* would not be persuasive in Silicani's case. Specifically, for the reasons discussed above, an attorney reasonably could have concluded *Wynn*'s reasoning was fallacious and inconsistent with the Tenth Circuit's approach to unit-of-prosecution issues. Thus, the attorney reasonably could have declined to rely on *Wynn*.

Moreover, an attorney who researched the overall legal landscape at the time of Silicani's sentencing reasonably could have concluded *Wynn* was an outlier. Apparently, no other circuit court had addressed § 1958's unit of prosecution. But as discussed above, the Sixth Circuit itself had issued a contrary unit-of-prosecution decision in *Ng*.[12] Without discussing the statute's unit of prosecution, other courts – including the Tenth Circuit – had rejected defendants' challenges to consecutive § 1958 sentences on other grounds.[13] In *Vasco*, the First Circuit had affirmed – albeit

---

[12] Furthermore, in other post-*Wynn* cases, without discussing the statute's unit of prosecution, the Sixth Circuit had repeatedly affirmed multi-count § 1958 convictions stemming from a single plot to murder a single victim. *See United States v. Hall*, No. 97-5053, 1998 WL 670025, at *1-4 (6th Cir. Sep. 18, 1998) (per curiam); *United States v. Williams*, No. 92-5658, 1993 WL 492296, at *1-6 (6th Cir. Nov. 29, 1993) (affirming the defendant's three-count conviction, citing *Wynn* on other grounds, and noting § 1958 has a ten-year statutory maximum sentence); *United States v. Johnson*, 443 F. App'x 85, 87-88, 96-97 (6th Cir. 2011) (affirming the defendant's sentences on various counts, including concurrent life sentences on two murder-for-hire convictions).

[13] *See United States v. Bloom*, 366 F. App'x 285, 287, 290 (2d Cir. 2010) (affirming consecutive 120-month sentences as substantively reasonable and noting the defendant's concession that the government correctly charged two separate counts); *United States v. Harrison*, 428 F. App'x 267, 268-70 (5th Cir. 2011) (per curiam) (affirming consecutive 120-month sentences as procedurally and substantively reasonable); *United States v. Mandel*, 647 F.3d 710, 712, 716-23 (7th Cir. 2011) (rejecting the defendant's entrapment and Commerce Clause arguments and affirming his 138-month sentence on six murder-for-hire counts involving a single

on Guidelines grounds – consecutive 120-month sentences for a defendant convicted of five murder-for-hire counts for a single plot with two intended victims. *See* 564 F.3d at 15-24. And various courts had affirmed multi-count § 1958 convictions where consecutive sentences were not at issue.[14] Without addressing § 1958's unit of prosecution directly, these cases demonstrated the typicality of charging and sentencing multiple § 1958 counts based on a single plot, rendering *Wynn*'s holding an outlier.

For all these reasons, Silicani's attorney was not deficient for failing to raise a unit-of-prosecution challenge under *Wynn*. Silicani cannot satisfy *Strickland*'s "performance" prong on this basis.

### 2.    An objectively reasonable attorney need not have foreseen the First Circuit's 2017 decision in *United States v. Gordon*.

Nor can Silicani satisfy *Strickland*'s "performance" prong based on *Gordon*. In the first place, although Silicani relies on *Gordon*'s merits in his § 2255 supplement, the supplement does not refer to ineffective assistance of counsel. (17-CV-197, ECF No. 2 at 2). Thus, Silicani never explains how *Gordon* – issued more than two years after his own sentencing – relates to his attorney's performance. Although a court must construe *pro se* arguments liberally, this obligation

---

plot); *United States v Raymond*, 10 F. App'x 513, 514-15 (9th Cir. 2001) (holding the district court properly imposed consecutive sentences under USSG §5D1.2(d)); *United States v. Bauer*, 995 F.2d 182, 182-84 (10th Cir. 1993) (dismissing the defendant's Guidelines-departure argument and otherwise affirming his 121-month sentence on two § 1958 counts).

[14] *See United States v. Morin*, 80 F.3d 124, 126 (4th Cir. 1996) (noting the defendant's convictions on three murder-for-hire counts stemming from a single plot); *United States v. Gibson*, 530 F.3d 606, 607-13 & n.1 (7th Cir. 2008) (rejecting the defendant's jury-instruction and sufficiency-of-evidence arguments and affirming his two murder-for-hire convictions); *United States v. Finley*, 175 F.3d 645, 646-47 (8th Cir. 1999) (rejecting the defendant's sufficiency-of-evidence, entrapment, and outrageous-governmental-conduct arguments and affirming his conviction on three murder-for-hire counts stemming from three letters and a single plot).

stops short of beginning to serve as the defendant's advocate. *United States v. Pinson*, 584 F.3d 972, 975 (10th Cir. 2009). Thus, even in a *pro se* proceeding under § 2255, a court "will not supply additional factual allegations or construct a legal theory on the litigant's behalf." *United States v. Rhodes*, 47 F. App'x 908, 909 (10th Cir. 2002) (ellipsis and brackets omitted). Here, Silicani <u>could have</u> raised *Gordon* under *Strickland*'s "performance" prong, *i.e.*, by arguing his attorney should have anticipated *Gordon*'s analysis and raised similar claims in his own case. But Silicani makes no such argument, and this court should decline to make it for him.

However, even if this court were to construe Silicani as arguing his attorney should have anticipated *Gordon*'s analysis, such a claim would not satisfy *Strickland*'s "performance" prong. The Sixth Amendment "does not require counsel for a criminal defendant to be clairvoyant." *Harms*, 371 F.3d at 1212. Thus, an attorney is not deficient if she fails to predict future developments in the law. *See id.* (citing *Brown v. United States*, 311 F.3d 875, 878 (8th Cir. 2002)); *United States v. Pennington*, 219 F. App'x 805, 807-08 (10th Cir. 2007) (holding defense counsel was not deficient for failing to anticipate *Booker*); *United States v. Keeling*, 116 F. App'x 958, 959 (10th Cir. 2004) (holding defense counsel was not deficient for failing to invoke a Supreme Court case that foreshadowed *Apprendi*).

In the present case, a reasonable attorney would not have anticipated *Gordon* or its analysis at the time of Silicani's sentencing. To the contrary, as discussed above, the existing legal landscape was replete with multi-count § 1958 cases based on multiple acts of travel or uses of interstate facilities. Both the Sixth Circuit's decision in *Ng* and the Tenth Circuit's general analytical framework supported a use-based unit of prosecution. Even *Wynn* did not foreshadow *Gordon*, because while the former relied on the Guidelines' grouping rules, the latter did not. *Compare Wynn*, 987 F.2d at 359, *with Gordon*, 875 F.3d at 35-38. Thus, a reasonable attorney

would not have anticipated *Gordon*'s analysis at the time of Silicani's sentencing, and Silicani's attorney was not deficient for failing to raise *Gordon*-type arguments.

> **3.      Silicani's attorney reasonably could have declined to raise a unit-of-prosecution issue as a tactical maneuver intended to avoid a related state prosecution for solicitation of first-degree murder.**

Admittedly, despite the dim prospects for success under existing case law, a reasonable attorney <u>might</u> have challenged § 1958's unit of prosecution anyway if he had nothing to lose. But Silicani had a great deal to lose, because he faced the potential of a parallel prosecution in state court. Therefore, a reasonable federal attorney could have declined to challenge § 1958's unit of prosecution as a tactic designed to minimize Silicani's overall sentencing exposure.

Wyoming law provides the backdrop. In pertinent part, Wyoming law defined first-degree murder as "purposely and with premeditated malice . . . kill[ing] any human being." WYO. STAT. § 6-2-101(a) (2013). Wyoming law further provided, "A person is guilty of solicitation to commit a felony if, with intent that a felony be committed, he commands, encourages or facilitates the commission of that crime under circumstances strongly corroborative of the intention that the crime be committed but the solicited crime is not attempted or committed." *Id.* § 6-1-302(a). Excluding the death penalty, Wyoming law punished solicitation the same as the underlying offense. *Id.* § 6-1-304. Thus, an adult convicted of solicitation of first-degree murder faced either "life imprisonment without parole or life imprisonment according to law." *See id.* § 6-2-101(b); *see also* § 6-2-101(c).

> The only distinction between the two sentences is the clemency for which each class is eligible. A prisoner serving life may have his sentence commuted by the governor and/or receive a pardon from the governor, at the governor's discretion. A life without parole prisoner cannot have his sentence commuted, but may be eligible for a pardon at the governor's discretion.

*Bird v. Wyoming Bd. of Parole*, 382 P.3d 56, 62 (Wyo. 2016) (citations omitted).  *See also Bear Cloud v. State*, 294 P.3d 36, 45 (Wyo. 2013) ("[T]he only way that a person serving a life sentence according to law may become eligible for parole in Wyoming is if the governor commutes the life sentence to a term of years.").

Here, based on Silicani's underlying conduct, the State of Wyoming easily could have charged and convicted him of soliciting the first-degree murders of his mother and stepfather.  *See generally Duke v. State*, 99 P.3d 928, 934 (Wyo. 2004).  As a separate sovereign, the state could have filed these charges after Silicani's federal sentencing without violating double jeopardy.  *See, e.g.*, *United States v. Smaldone*, 485 F.2d 1333, 1343 (10th Cir. 1973).  At a minimum, Silicani would have faced concurrent life sentences, with parole eligibility only if the governor commuted the sentences.  *See* § 6-2-101; *Bear Cloud*, 294 P.3d at 45.[15]  On the high end, Silicani would have faced consecutive life sentences without the possibility of parole.  *See* § 6-2-101; *Kennedy v. State*, 890 P.2d 37, 38 (Wyo. 1995) ("The determination of whether sentences are to run consecutively or concurrently is completely within the discretion of the trial court.").

In Silicani's federal case, a reasonable defense attorney would have recognized the potential for a successive state prosecution.  In fact, Silicani's defense attorney did recognize this potential, because the United States' thirty-five-year plea offer included a non-prosecution agreement from the state.  (Change-of-Plea Transcript at 22).  Thus, Silicani's attorney faced a strategic dilemma: how to minimize his client's federal sentence while simultaneously avoiding a successive prosecution in state court?

---

[15] In this hypothetical scenario, it is unclear exactly how much time Silicani would have served, or whether the governor would have commuted his sentences at all.  "The governor considers commutation requests upon the recommendation of the [Wyoming Board of Parole]," which considers various factors in making its recommendations.  *Bird*, 382 P.3d at 63.

Facing this dilemma, an objectively reasonable attorney could have done exactly as Silicani's attorney did. Considering the potential state sentences and the government's plea offer, an attorney reasonably could have predicted a sentence of 120 months would not forestall a successive state prosecution. Thus, an attorney reasonably could have decided to forego a unit-of-prosecution challenge under *Wynn*. Not only was such a challenge likely to fail, but if it had succeeded, it might have resulted in Silicani receiving life sentences in state court.

In the same vein, however, an attorney reasonably could have predicted a sentence of less than thirty-five years would be substantial enough to satisfy the state. Thus, rather than accepting the government's plea offer, a reasonable attorney could have advised Silicani to plead guilty without an agreement, as Silicani's attorney did. (Change-of-Plea Transcript at 22). Similarly, at sentencing, a reasonable attorney could have advocated strenuously for a 240-month sentence, as Silicani's attorney did. (Sentencing Transcript at 8-9, 13-21). Although the record does not reveal why Silicani's attorney settled on 240 months, he reasonably could have concluded a twenty-year sentence would be sufficient to satisfy the state. Moreover, at only five months above the low end of Silicani's Guidelines range, he reasonably could have concluded a 240-month sentence was the lowest federal sentence he could hope for under the circumstances.[16] Thus, advocating for a 240-month sentence was objectively reasonable.

---

[16] Conceivably, while foregoing a plot-based unit-of-prosecution challenge under *Wynn*, Silicani's attorney could have raised a victim-based unit-of-prosecution challenge as an extension of the First Circuit's 2009 decision in *Vasco*, 564 F.3d 12. In *Vasco*, the district court collected the defendant's five § 1958 convictions (relating to the intended murders of his wife and daughter) into two offense groups under §3D1.2(b) and imposed two consecutive 120-month sentences. *See* 564 F.3d at 17-18, 23. Vasco argued the district court should have grouped all five counts together under the Guidelines and that his 240-month aggregate sentence exceeded the ten-year statutory maximum under § 1958(a). *See id.* at 15, 21, 23. The First Circuit rejected Vasco's grouping argument, because his offense involved two victims. *See id.* at 23. The First Circuit also upheld the 240-month aggregate sentence, albeit on Guidelines grounds. *See id.* at 23-24. In this vein,

Silicani ignores this issue in his § 2255 pleadings.  He neither analyses nor even mentions his potential sentencing exposure in state court, his attorney's resulting strategic dilemma, nor the objective reasonableness of the strategy his attorney employed.  (*See* 17-CV-197, ECF Nos. 1 and 2).  By failing to discuss the issue, he has failed to satisfy *Strickland*'s "performance" prong.

Ultimately, of course, his attorney's strategy was not entirely successful.  On the one hand, Silicani has – to date – avoided state prosecution for his conduct.  On the other hand, despite his attorney's capable efforts, this court varied upward and sentenced Silicani to thirty-five years in prison, just as he would have received under the government's plea offer.  But even though his attorney's strategy did not entirely succeed, "[s]uccess is not the test of effective assistance of counsel."  *Johnson v. United States*, 380 F.2d 810, 812 (10th Cir. 1967).  Rather, because Silicani's defense attorney employed an objectively reasonable strategy, this court should reject Silicani's ineffective-assistance claim under *Strickland*'s "performance" prong.  *See Bullock*, 297 F.3d at 1050-51.

---

the First Circuit noted that *Wynn* was distinguishable, because *Wynn* involved only one intended victim.  *See id.* at 23-24 & n.9.

Although *Vasco* did not address § 1958's unit of prosecution directly, Silicani's attorney conceivably could have relied on *Vasco* to argue § 1958 permits only one count per intended victim.  But Silicani's attorney was not deficient for neglecting or declining to raise this argument.  First, because Silicani neither cites nor relies on *Vasco* in his pleadings, this court should not assume the role of Silicani's advocate by constructing a *Vasco*-based argument for him.  *See Rhodes*, 47 F. App'x at 909.  Moreover, because this court had already grouped Silicani's § 1958(a) counts in accordance with *Vasco* under the Guidelines, a reasonable attorney need not have argued for a further extension of *Vasco* to challenge the statute's underlying unit of prosecution.  And finally, because *Vasco* was not controlling authority and did not address § 1958's unit of prosecution directly, a reasonable attorney in Silicani's case need not have relied on *Vasco* to extrapolate a unit-of-prosecution argument.

#### 4.   Conclusion

For all these reasons, declining to raise a unit-of-prosecution challenge in Silicani's case was objectively reasonable.  Thus, Silicani cannot satisfy *Strickland*'s "performance" prong, and this court should reject his unit-of-prosecution claim.

**e.   Silicani received effective assistance from appellate counsel in his direct appeal.**

This court should similarly reject any challenge to the effectiveness of Silicani's appellate counsel.  "[W]innowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Challoner*, 583 F.3d at 749 (quotation marks omitted).  As a general matter, "[w]hen considering a claim of ineffective assistance of appellate counsel for failure to raise an issue, [a reviewing court looks] to the merits of the omitted issue."  *Hooks v. Ward*, 184 F.3d 1206, 1221 (10th Cir. 1999). But if appellate counsel failed to raise an issue that already had been omitted below, a reviewing court must determine whether the issue would have overcome plain-error review on appeal.  *See Pennington*, 219 F. App'x at 809 ("Simply put, Ms. Pennington would not have satisfied plain error review on appeal.").

Here, Silicani's appellate counsel was not ineffective for declining to raise the unit-of-prosecution issue on direct appeal, because the issue would not have overcome plain error review. "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Games-Perez*, 695 F.3d 1104, 1108 (10th Cir. 2012).  To be "plain," an error must be "clear and obvious" under the law in effect at the time of the appeal.  *See United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005); *id.* at 744 (Hartz, J., concurring).  As discussed above, at the time of Silicani's appeal, the existing legal landscape supported his four

separate § 1958(a) counts.  Thus, any unit-of-prosecution error was not "plain."  And thus, because

the issue had not been raised below, counsel was not ineffective for declining to raise it in Silicani's

direct appeal.

      **f.**   **Alternatively, even if this court were to hold Silcani's attorneys were ineffective for declining to raise a unit-of-prosecution argument, this court should not merge his four § 1958(a) counts into one.  Rather, because Silicani's plot involved two intended victims, this court should merge his four counts into two and impose a sentence of 240 months.**

Even if this court were to disagree with the foregoing arguments and hold Silicani's

attorneys were ineffective for not raising a unit-of-prosecution claim, this court should not afford

Silicani the remedy he seeks, *i.e.*, a sentence of no greater than 120 months on a single § 1958(a)

count.  Rather, because Silicani's murder-for-hire plot involved two intended victims, he should

face a minimum of two § 1958(a) counts and a sentence of 240 months.

Admittedly, the First Circuit rejected a similar argument in *Gordon*, but *Gordon* is

distinguishable on this point.  In *Gordon*, the government alleged two intended victims in each of

Gordon's five § 1958(a) counts, but it apparently did not utilize a special verdict form, and the jury

therefore had no opportunity to decide whether Gordon intended to have both victims killed.  *See*

875 F.3d at 32 n.3, 38 n.8.  In the present case, however, Silicani's factual basis for his guilty pleas

plainly established his intent to have both his mother and stepfather murdered.  (Change-of-Plea

Transcript at 23).  Thus, even under a plot-based unit of prosecution, because Silicani's murder-

for-hire plot undeniably involved two intended victims, he should face at least two § 1958(a)

counts.  *Cf. id.*; *Vasco*, 564 F.3d at 15-24.  Under this alternative, for the same reasons this court

originally sentenced Silicani to 420 months, a 240-month sentence would be justified on

resentencing.

### III. Impartiality Issue

Apart from the unit-of-prosecution issue, Silicani claims the magistrate judge was biased or had a conflict of interest, because the judge attends the same church as Silicani's mother and stepfather and has a "social relationship" with them.  (17-CV-197, ECF No. 1 at 11).  Again, Silicani proffers ineffective assistance of counsel as the reason he did not raise this argument on direct appeal.  (17-CV-197, ECF No. 1 at 11).

This court should summarily reject this claim.  Silicani's assertions do not establish any actual or presumed conflict of interest that would have required the magistrate judge to disqualify himself.  *See* 28 U.S.C. § 455.  Moreover, even assuming Silicani did not waive this issue by pleading guilty, *see generally United States v. Gipson*, 835 F.2d 1323 (10th Cir. 1988), he has utterly failed to show how his attorney(s) were ineffective under *Strickland* for failing to assert the issue.  The magistrate judge handled preliminary matters, but Silicani ultimately pled guilty and was sentenced before this court.  Thus, Silicani cannot show how the magistrate judge's involvement had any impact on the outcome of his case, or how his attorney was deficient for failing to raise the issue.  This court should therefore reject his claim.

### IV.    Conclusion

For all these reasons, this court should deny Silicani's § 2255 motion.

DATED this 17th day of April, 2018.

Respectfully submitted,

MARK A. KLAASSEN
United States Attorney


By:    _____/s/ *Thomas Szott*_____
THOMAS SZOTT
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on the 17th day of April, 2018, I served a true and correct copy of the

foregoing United States' Response to the Defendant's Motion Under 28 U.S.C. § 2255 upon the

following by depositing the same, postage prepaid, in the United States mail, addressed to:

Andrew Lambert Silicani
14126-091 Inmate Mail/Parcels
U.S. Penitentiary
P.O. Box 1000
Lewisburg, PA 17837


        */s/Kylie Severns*
For the United States Attorney's Office