
# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

ANDREW LAMBERT SILICANI,

               Petitioner,

vs.

UNITED STATES OF AMERICA

               Respondent.

Case No: 17-CV-197-F
           15-CR-57-F

---

## ORDER DENYING PETITIONER'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

---

This matter is before the Court on Defendant/Petitioner Andrew Lambert Silicani's (Silicani) Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. The Government responded to the motion and Silicani failed to submit a reply. The Court has reviewed the filings and is fully informed in the premises and FINDS and ORDERS as follows:

### BACKGROUND

**Factual Background**

Adopted as a newborn, Andrew Silicani originally lived with his mother and father in California. (Docket Report for *United States v. Silicani*, 15-cr-57-F, Doc. 49 at 13, ¶ 42 [PSR] (hereinafter "Doc. __")). Silicani had significant problems during his childhood. (PSR at 13-14, ¶41-49). His parents provided him with significant mental health and counseling resources. (*Id*.). Based on his behavioral issues, his parents

eventually sent him to a boarding school in Michigan, where he graduated from high school a year early. (PSR at 14, ¶ 46). Silicani's parents divorced in 2008. (PSR at 15, ¶ 50).

After graduating, Silicani returned to California to live with his father, but he began abusing controlled substances and engaging in criminal behavior. (PSR at 10, 50-2 at 16-17). He subsequently moved to Cheyenne, Wyoming, to live with his mother. (PSR at 10-11, 16-17; Doc. 50-2 at 17-18).

Shortly after moving to Cheyenne, Silicani stabbed two victims in separate attacks. On January 17, 2011, he stabbed a marijuana dealer in the arm (but was never prosecuted). (PSR at 12, ¶ 38; Doc. 50-2 at 22; Doc. 68 at 28 [Sent. Tran]). Ten days later, on January 27, 2011, Silicani and some acquaintances were driving in an SUV after partying, drinking, and smoking marijuana. (Doc. 50-2 at 15). As they were driving, they saw a man rollerblading along the street. (*Id.*). Silicani and one of his acquaintances attacked the victim and Silicani stabbed the victim six times in the arm, chest, abdomen, and buttock; and the acquaintance took the victim's backpack. (*Id.*). While he was running from the scene Silicani dropped his cellphone, which authorities used to identify him as a suspect. (*Id.*). Silicani later confessed to the robbery and admitted he thought he had killed the victim. (*Id.*).

Eventually, Silicani pled guilty to state felony charges of Conspiracy to Commit Robbery and Robbery with Bodily Injury. (Doc. 50-2 at 1). He received concurrent five-to-seven-year prison terms, and after failing to complete boot camp, he ultimately arrived

at the Wyoming State Penitentiary ("WSP") in Rawlins to serve his sentences. (PSR at 11, 17).

Meanwhile, Silicani's mother remarried in 2012. While imprisoned at the penitentiary, Silicani decided to hire a hit man to murder his mother and stepfather so he could collect money from his mother's life insurance. (PSR at 5-7). In the fall of 2014, Silicani solicited a fellow inmate to commit the murders. (PSR 49 at 5). The inmate contacted prison officials and eventually began cooperating with the FBI. (*Id.*).

Aided by the inmate, the FBI conducted an undercover investigation. (*Id.*). After the FBI established an undercover P.O. Box number in Colorado, the inmate told Silicani the P.O. Box belonged to a hit man. (*Id.*). Silicani began corresponding and negotiating with the purported hit man (actually FBI agents), sending four letters from the penitentiary to the Colorado P.O. Box address between December 29, 2014, and February 18, 2015. (*Id.* at 5-7). Among other things, Silicani agreed to pay $100,000 "for Both Jobs." (*Id.* 49 at 5-7).

Early in the investigation, the inmate began sending letters to the FBI to report what was happening at the penitentiary. In one such letter, dated December 19, 2014, the inmate reported, "Silicani told me after his parents in [C]heyenne were dead and he got the money from the insurance, car, house, etc. he wanted his Dad in California to be killed as well so he can collect from that one too." (Doc. 50-3 at 3).

On February 18, 2015, an undercover agent posing as the hit man met with Silicani at the penitentiary. (PSR at 7; Doc. 50-1). In that meeting, Silicani stated that his mother had a $500,000.00 life insurance policy and that he and his step-father were the

beneficiaries. (PSR at 7). Silicani explained that with both his mother and step-father dead, he would receive the full amount and agreed to pay $125,000.00 for both murders. (*Id*.). The $125,000.00 was higher than the $100,000.00 he initially agreed to pay, because Silicani was unable to provide any upfront payment. (*Id*.).

During that conversation the undercover agent asked whether Silicani cared about the details of the murders. Among other things, the agent asked Silicani, "Now, you don't want them to suffer, you don't want them to see it coming, or you don't care?" (Doc. 50-1 at 24:25). Lowering his voice, Silicani said something like, "I don't even care." (*Id*. at 24:29).

The Court will address other facts as necessary to address the issues raised in Silicani's § 2255 motion.

**Procedural History**

Based on these events, the FBI arrested Silicani at the penitentiary after the undercover meeting on February 18. (Docs. 1, 13, 14). On March 19, 2015, the grand jury charged Silicani with four counts of using the mail in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958. (Doc. 29). Subsequently, the Government offered Silicani a plea agreement to a stipulated thirty-five-year (420 month) sentence with a provision that the state would not prosecute him for his underlying conduct. (Doc. 71 [COP. Tran.] at 22). However, Silicani rejected that plea agreement. (*Id*.). Rather, on April 27, 2015, Silicani appeared before this court and entered "cold" guilty pleas to all four counts of the Indictment. (*Id*. at 22, 25-26). Among other things, Silicani admitted he "used the mail, wrote four letters . . . asking for this to be done, for the murders of my

mom and dad -- stepdad." (*Id*. at 23-25).   The Court inquired as to why Silicani was

interested in murdering his mother and stepfather and Silicani answered:

> Your Honor, I at the time -- I mean, it was for the life insurance policy,
> Your Honor. Um, I -- sorry. I'm not good at talking. Your Honor, it was for
> that. Obviously it was, you know, big error in judgment obviously. And,
> you know, I'd take it back if I could, you know.

(*Id*. at 24).   The Court accepted Silicani's guilty pleas.  (*Id*. at 26).

The assigned probation officer filed the revised Presentence Investigation Report

(PSR) on June 23, 2015, including a calculation of the advisory Sentencing Guidelines.

(Doc. 49 at 1, 9-10, ¶¶ 12-32). Beginning at base offense level 37, Silicani received a

two-point upward adjustment because the offense involved multiple counts and two

intended victims, then a three-level reduction for his timely acceptance of responsibility,

resulting in a total offense level of 36. (*Id*.). Because he was in criminal history category

III, his advisory guideline range was 235 to 293 months imprisonment. (*Id*. at 17, ¶ 67).

The PSR recommended an upward variance and a sentence of 432 months. (*Id*. at 19-20,

¶¶ 85-86).

The Court sentenced Silicani on July 9, 2015. (Doc. 53 [Minute Entry]; Doc. 68

[Sent. Tran.]). Neither party objected to the revised PSR or the Court's recitation of the

Guidelines calculation. (Doc. 68 [Sent. Tran.] at 4, 6-7). The Government advocated for a

forty-year, (480 month) statutory-maximum sentence. (*Id*. at 10-13). Silicani's attorney

advocated for a 240-month sentence, citing Silicani's mental health issues, characterizing

a forty-year sentence as "simply punitive," and giving examples of other cases from the

District of Wyoming that resulted in lower sentences. (*Id*. at 8-9, 13-21).

Silicani's mother was present at the sentencing and talked about loving and forgiving her son but realizing that she could no longer help him. (*Id*. at 21-22). She talked about her surprise when she was informed of the murder for hire plot. (*Id*. at 22). She also stated her fear that Silicani would "be released during [their] lifetimes and [would] again make an attempt on [their] lives." *(Id*. at 23). She also stated that she was fearful for her husband's 19-year-old daughter as well. (*Id*.).

After hearing arguments and statements from the victims and Silicani, the Court imposed an aggregate sentence of 420 months: three consecutive 120-month sentences on Counts One through Three, followed by a consecutive sixty-month sentence on Count Four. (*Id*. at 29-30). In justifying the sentencing enhancement, the Court stated:

> Your mother, who stood by you through the entire course of your life, has poured resources into making you the son that she wanted you to be and that you deserved to be, to have this be the outcome is heartbreaking. She not only poured resources in terms of mental health resources, but even while you were in prison sent money and gifts, purchased items for you on demand. And to have this be the mindset that you come away with to plan such a heinous offense, really with no apparent interest in anything other than the greed and receiving money. For what? For a new car? For ten tattoos and drugs?

> To exchange a life for such juvenile desires is hard to comprehend. And to then express that you really don't care if there's suffering involved is even harder to comprehend. And to make matters worse, as though they could be worse, to talk about taking a similar action against your father, who I understand you've had issues with, but apparently he wasn't first on your list because you didn't know whether he had any resources that would ever come your way. I'm not sure. This to me is impossible, impossible to understand.

> So, considering the callous disregard that you've held toward other people for -- for such a long time, the potential continuing danger that you present to society, with disordered ways of thinking that are very difficult to change and an approach that appears to lack explanation other than, again, a

callous disregard for not just life but for those people that care and love you as you stand here today, and greed is – are factors that elevate this case beyond just a desire for punishment.

I don't sit up here desiring to punish anyone. But you with the -- with your mindset and your nature, your past history, the particular chilling nature of the offense warrants an upward variance, and I'll vary upward four levels and sentence you to 420 months.

Doc. 68 at 29-30.

Silicani appealed his sentence on two grounds. See *United States v. Silicani*, 650 F. App'x 633, 634 (10th Cir. 2016). First, he argued the Court abused its discretion by "failing to sua sponte order a hearing under 18 U.S.C. § 4244 to assess whether he should have been hospitalized rather than imprisoned. Second, he argue[d] that his above-guidelines sentence was substantively unreasonable." *Id.* The Tenth Circuit rejected Silicani's arguments and affirmed the judgment and sentence. *Id.* at 634, 636-37, 639.

Silicani then petitioned the Supreme Court for a writ of certiori, which the Supreme Court denied on November 28, 2016. See *Silicani v. United States*, 137 S. Ct. 531 (2016). At that point, Silicani's convictions became final. See, e.g., *United States v. Prows*, 448 F.3d 1223, 1227 (10th Cir. 2006). On November 24, 2017, Silicani timely filed his § 2255 motion. (*Silicani v. U.S.*, 17-CV-197, Doc. 1). Three days later, on November 27, 2017, Silicani filed a supplement to his motion. (*Silicani v. U.S.,* 17-CV-197, Doc. 2).

**DISCUSSION**

Silicani makes two claims in his § 2255 motion. In Ground One, he claims that all his counts should have been grouped together under one count. In Ground Two, Silicani claims conflict of interest or bias of the magistrate judge.

*Standard for Reviewing § 2255 Claims*

In considering Silicani's claims of error, it is important to discuss the standard for reviewing § 2255 claims. Section 2255 entitles a prisoner to relief "[i]f the Court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b). The standard applied to § 2255 motions is stringent. "Only if the violation constitutes a fundamental defect which inherently results in a complete miscarriage of justice, or an omission inconsistent with the rudimentary demands of fair procedure can § 2255 provide relief. *United States v. Gordon*, 172 F.3d 753, 755 (10th Cir. 1999) (internal quotations omitted). The Court presumes the proceedings which led to defendant's conviction were correct. *See Parke v. Raley*, 506 U.S. 20, 29-30 (1992).

"Section 2255 motions are not available to test the legality of matters which should have been raised on direct appeal." *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994). A Court may only reach the merits of a defaulted claim where the petitioner has shown "both (1) cause excusing his double procedural default, and (2) actual prejudice resulting from the errors of which he complains." *United States v.*

*Frady*, 456 U.S. 152, 168 (1982) (citations and quotation marks omitted). In order to establish "cause," a defendant must show that there existed some external impediment which prevented him from raising this claim during the original proceedings on his case, or on direct appeal. *Murray v. Carrier*, 477 U.S. 478, 492 (1986). A petitioner could show "cause" by demonstrating that his claim was so novel that its legal basis was not reasonably available to his counsel. See *Reed v. Ross*, 468 U.S. 1, 16 (1984). A petitioner could also establish "cause" by demonstrating that the constitutional violations he complains of in support of his § 2255 motion resulted in a "fundamental miscarriage of justice;" i.e., that they resulted in the conviction of a person who was actually innocent of the charged crime. See *United States v. Cervini*, 379 F.3d 987, 990-91 (10th Cir. 2004). A petitioner can also establish "cause" by showing that he received ineffective assistance of counsel.

To prevail on an ineffective assistance of counsel claim under § 2255, a petitioner must meet the well-established two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *United States v. Taylor*, 454 F.3d 1075, 1079 (10th Cir. 2006). That is, the petitioner must show: (1) "counsel's performance was deficient" ("fell below an objective standard of reasonableness"); and (2) "the deficient performance prejudiced the defense" ("there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different"). *Strickland*, 466 U.S. at 687-88, 694. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed" *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000) (quoting *Strickland*, 466 U.S. at 697).

The Court's review is "highly deferential," based on "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Taylor*, 454 F.3d at 1079 (quoting *Strickland*, 466 U.S. at 689). "Where the basis of the ineffective assistance claim is "the failure to raise an issue, [the Court] must look to the merits of the omitted issue." *United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006). "If the omitted issue is without merit, then counsel's failure to raise it is not prejudicial, and thus is not ineffective assistance." *Id.*

> In analyzing whether counsel's alleged errors prejudiced petitioner, [the Court] must keep in mind the standard to be applied in assessing whether petitioner is entitled to an evidentiary hearing in federal Court on his ineffectiveness claim. First, the petitioner bears the burden of alleging facts which, if proved, would entitle him to relief. Moreover, his allegations must be specific and particularized; conclusory allegations will not suffice to warrant a hearing.

*Hatch v. State of Oklahoma*, 58 F.3d 1447, 1457 (10th Cir. 1995) (overruled on other grounds by *Daniels v. United States*, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001)) (citations and quotations omitted). With these standards in mind, the Court will consider Silicani's claims.

## A. Ineffective Assistance of Counsel Claims

In his § 2255 motion, Silicani claims that his four counts should have been grouped into one count. He also claims the Court improperly grouped his Counts in calculating in sentencing guideline. This first issue is the appropriate unit-of-prosecution under the murder-for-hire statute, 18 U.S.C. § 1958. A statute's unit-of-prosecution

governs whether a defendant's "conduct constitutes one or several violations of" that statute. *Callanan v. United States*, 364 U.S. 587, 597 (1961). A unit-of-prosecution violation, or "multiplicity" occurs when the Government charges a defendant with multiple counts for a single statutory violation. *United States v. Johnson*, 130 F.3d 1420, 1424 (10th Cir. 1997). Silicani argues his conduct constituted only a single violation of § 1958, and therefore, his statutory-maximum sentence should have been 120 months. He also argues that the four counts should have grouped together under §3D1.2 of the Sentencing Guidelines.

The Government argues this issue is procedurally barred and should be considered under the *Strickland* framework, rather than on the merits.[1] The Court agrees. As the Court previously noted, "Section 2255 motions are not available to test the legality of matters which should have been raised on direct appeal." *Warner*, 23 F.3d at 291. A Court may only reach the merits of a defaulted claim where the petitioner has shown "both (1) cause excusing his double procedural default, and (2) actual prejudice resulting from the errors of which he complains." *Frady*, 456 U.S. at 168 (citations and quotation marks omitted). Silicani is not arguing actual innocence or some impediment that prevented his appellate attorney from raising the issue during his appeal. As a result, he can only overcome the procedural bar by demonstrating that either his trial counsel or his appellate counsel was constitutionally deficient under *Strickland*.[2]

---

[1] "[I]f the government raises procedural bar, the courts must enforce it and hold the defendant's claims procedurally barred unless cause and prejudice or a miscarriage of justice is shown." *United States v. Allen*, 16 F.3d 377, 378 (10th Cir. 1994)

[2] Cause may be established under this exception by demonstrating ineffective assistance of counsel. *United States v. Wiseman*, 297 F.3d 975, 979 (10th Cir. 2002).

### 1.  Ineffective Assistance of Counsel – Trial Attorney

While Silicani does not address his claim under the *Strickland* standard, the Court will consider his arguments under this standard.  In liberally construing his motion, the Court considers Silicani as arguing his trial counsel was ineffective for failing to raise the unit-of-prosecution argument during his case and was also ineffective for failing to object to the PSR's calculation of the sentencing guideline based on the grouping of counts under § 3D1.2(b).  The Court will first consider the unit-of-prosecution argument.

### a.  Unit-of-Prosecution Argument

The Government urges the Court to first consider whether Silicani was prejudiced by his counsel's failure to raise this issue.  However, the Court finds this case is more appropriately determined by considering whether Silicani's trial counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 689. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*.  As the Supreme Court explained in Strickland:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (internal citations and quotation marks omitted). Using this standard, the Court finds Silicani's counsel's performance met the objective standard of reasonableness.

To support his unit-of-prosecution argument, Silicani relies on a case from the Sixth Circuit, *United States v. Wynn*, 987 F.2d 354, 359 (6th Cir. 1993) (finding that separate phone calls relating to one plan to murder one individual constituted only one violation of 18 U.S.C. § 1958) and a case from the First Circuit, *United States v. Gordon*, 875 F.3d 26 (2017) (" the proper unit-of-prosecution under the murder-for-hire statute is a single plot to murder a single individual.").

However, Silicani fails to assert any argument as to why his counsel's failure to make this argument was constitutionally ineffective. First, the Court would note that the *Gordon* case came out after Silicani's change of plea and sentencing in this case, therefore the Court will not consider *Gordon* in judging Silicani's counsel's actions in this case. As a result, Silicani's ineffective assistance of counsel argument must be that his counsel was ineffective for not finding *Wynn* and arguing a unit-of-prosecution argument related to 18 U.S.C. § 1958. First, the *Wynn* case is from the Sixth Circuit and is not "a controlling fixture of the legal landscape survey[ed] by [Silicani's] counsel and the district court at the time of the sentencing, and it has no binding force in our assessment of the merits of [Silicani's] ineffective-assistance claim." *United States v. Hendrickson*, 592 F. App'x 699, 703 (10th Cir. 2014).

Rather, in considering the legal landscape of the Tenth Circuit and other circuits, it was not objectively unreasonable for Silicani's counsel to determine this argument lacked

merit.  At the time of Silicani's criminal proceedings, only the Sixth Circuit had addressed § 1958's unit-of-prosecution.  *United States v. Gordon*, 875 F.3d 26, 35 (1st Cir. 2017) (noting *Wynn* was the only other published circuit court decision squarely on point).  Additionally, there was a later, unpublished Sixth Circuit opinion that took an opposing view to *Wynn*, without any discussion of *Wynn*.  See *United States v. Ng*, 26 Fed.Appx. 452 (6th Cir. 2001) (per curiam).  In *Ng*, the Sixth Circuit found "[t]he plain language of the statute makes clear that the evil it intended to proscribe was the interstate travel and use of facilities in interstate commerce with intent that a murder-for-hire be committed." *Id*. at 462.  The Sixth Circuit affirmed Ng's three convictions under § 1958 for the same murder plot.

Additionally, while the Tenth Circuit has never addressed the unit-of-prosecution for charges under § 1958, the Tenth Circuit has considered other unit-of-prosecution cases.  Around the same time the Government filed charges against Silicani, the Tenth Circuit issued its *en banc* opinion in *United States v. Rentz*, 777 F.3d 1105 (10th Cir. Feb. 3, 2015).  In *Rentz*, the Tenth Circuit considered the unit-of-prosecution under 18 U.S.C. § 924(c)(1)(A).  The Tenth Circuit explained a unit-of-prosecution is the "minimum amount of activity for which criminal liability attaches." *Id*. at 1108.  "When seeking a statute's unit-of-prosecution—when asking what the minimum amount of activity a defendant must undertake, what he must do, to commit each new and independent violation of a criminal statute—the feature that naturally draws our immediate attention is the statute's verb." *Id*. at 1109.  The Tenth Circuit also reasserted that if there was any

ambiguity about the meaning of a statute, then the Court defaults to the rule of lenity. *Id.* at 1113.

In considering the unit-of-prosecution for § 1958, the Court looks to the language of the statute, which provides:

> (a) Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

18 U.S.C. § 1958.

This statute is similar to the Travel Act, 18 U.S.C. § 1952, which prohibits interstate travel or the use of interstate facilities in aid of racketeering. In *United States v. Villano*, the Tenth Circuit found that the key element of the federal offense is the act of travel or the use of interstate facilities, and upheld multiple convictions under the Travel Act. *United States v. Villano*, 529 F.2d 1046, 1062 (10th Cir. 1976).

In supporting its finding in *Villano*, the Tenth Circuit relied on its much earlier decision in *Mitchell v. United States* regarding the mail fraud statute. 142 F.2d 480 (10th Cir. 1944). In *Mitchell*, the Court found that, while the crimes charged were all part of one continuous scheme to defraud, "the gist and crux of the offense is the use of the mails in the execution of the scheme; it is the use of the mails for the purpose of executing the scheme which gives the federal courts jurisdiction over the offense." *Id.* at 481

The plain distinction lies in the difference between one continuing offense which may be consummated by a single or plural acts over a period of time, as in the Snow and Braverman cases, and an indictment which alleges a continuing scheme and artifice to defraud, which is made criminal under the law each and every time the mail is used in execution thereof, and only when and if the mails are used.

The indictment here under consideration does not allege a continuing offense, but rather a continuing scheme, which is made criminal by the separate use of the mails in the execution thereof, thereby constituting a separate and distinct crime each time the mails were used.

*Id*.

In the same vein, the "gist" of an offense under § 1958 is the travel or use of mail to commit murder. The statute punishes the act of using interstate travel or mail with intent to commit murder, the offense does not require a murder to be carried out or attempted. Therefore, if the murder-for-hire plot is a scheme, rather than one continuing offense, a separate and distinct violation of the statute occurs with each use of the mail.

Given this legal landscape in the Tenth Circuit and the existence of only one published opinion from a different circuit on unit-of-prosecution for § 1958 claims, it was not objectively unreasonable for Silicani's counsel not to raise the issue of multiplicity in the unit-of-prosecution.

Finally, in considering Silicani's counsel's actions, it is important to consider the particular facts in this case. It is possible that Silicani's counsel decided not to raise the unit-of-prosecution issue to avoid related state charges for solicitation of first-decree murder. The relevant Wyoming law at the time defined first-degree murder as "purposely and with premeditated malice . . . kill[ing] any human being." Wyo. Stat. Ann. § 6-2-101(a) (2013). Additionally, "A person is guilty of solicitation to commit a

felony if, with intent that a felony be committed, he commands, encourages or facilitates the commission of that crime under circumstances strongly corroborative of the intention that the crime be committed but the solicited crime is not attempted or committed." Wyo. Stat. Ann. § 6-1-302(a). Wyoming law punishes solicitation the same as the underlying offense, with the exception that the death penalty is not available for solicitation. Wyo. Stat. Ann. § 6-1-304. Thus, if the state charged Silicani with solicitation he faced either "life imprisonment without parole or life imprisonment according to law." Wyo. Stat. Ann. §§ 6-2-101(b) and (c).

In this case, the State of Wyoming could have decided to charge Silicani with two counts of solicitation of first-decree murder after his federal charges, with a potential sentence of two consecutive life sentences.[3] Silicani's counsel recognized this possibility and attempted to mitigate the possibility through a plea agreement including a non-prosecution agreement from the state. (Doc. 71 [COP Tran.] at 21). Silicani's counsel discussed the Government's offer of an 11(c)(1)(C) plea agreement for 35 years, with an understanding that Silicani would not face state charges, but Silicani rejected that plea agreement and entered a cold plea. (*Id*. at 22).

It was reasonable for Silicani's attorney to anticipate that a federal sentence of 120 months would trigger the filing of state charges. Silicani's counsel could have determined that the best course of conduct was to go forward and argue a guideline-range sentence of 240 months, which he could have judged as being a sufficient amount of

---

[3] Given that Wyoming does not have a statute of limitations for this offense, it appears the State of Wyoming could still file these charges at any time.

incarceration to forestall the filing of state charges. Additionally, he could have considered that he had a reasonable chance of prevailing on a guideline range sentence of 240 months before a Judge who rarely gave above guideline sentences. While this strategy did not work out, based mainly on the Court's decision to provide a significant upward variance, it was still an objectively reasonable strategy.

For all these reasons, the Court finds Silicani failed to establish that his counsel was constitutionally ineffective for failing to raise the unit-of-prosecution argument in this case. Usually, the Court would also consider whether Silicani was prejudiced by his counsel's ineffectiveness. However, the Court hesitates to determine what the Tenth Circuit would do with the underlying unit-of-prosecution issue. While the Court agrees with the Government's analysis and reasons for rejecting the First Circuit's decision in *Gordon*, it is unnecessary for the Court to analyze and decide this issue, because Silicani failed to establish *Strickland*'s first prong, that his counsel's performance was objectively unreasonable as it relates to the unit-of-prosecution theory.

### b. Grouping of Counts Under the Guidelines

Silicani also appears to claim his trial counsel was ineffective for failing to object to the PSR's grouping of his counts. The PSR provided a multiple count adjustment of two levels because there were four counts and two victims. Silicani appears to argue that pursuant to USSG 3D1.2(b), his counts should have all been grouped together, avoiding the multiple count adjustment. Specifically, USSG 3D1.2(b) provides for grouping all counts involving substantially the same harm, which "counts involved the same victim and two or more acts or transactions connected by a common criminal objective or

constituting part of a common scheme or plan."   However, Silicani intended for two victims to be murdered.  Therefore, the PSR properly grouped his four § 1958(a) counts into two groups, resulting in a two-level enhancement under §3D1.4(a).

Silicani relies on the Sixth Circuit decision in *United States v. Wilson*, 920 F.2d 1290, 1294 (6th Cir. 1990) (addressing grouping under USSG 3D1.2) to support this claim.  However, given the facts in this case, *Wilson* does not suggest a contrary result. *Wilson's* murder-for-hire plot involved only one intended victim. *Id*. at 1293-94.  In this case, Silicani's murder-for-hire plot involved two victims, his mother and step-father.  In this respect, his case is more like the First Circuit's decision in *United States v. Vasco*, 564 F.3d 12, 15- 32 18, 23 (1st Cir. 2009).  In that case, the First Circuit upheld two groups for five § 1958 counts, because the defendant intended to have both his wife and daughter murdered.

Additionally, as the Court previously noted, Silicani's counsel could have been concerned about the potential for state charges, if Silicani's federal sentence was too low. If successful, Silicani's total offense level would have been 34, criminal history category III, for a guideline range of 188-235.  It is possible that Silicani's counsel worried that anything under 240 months would have prompted the filing of state solicitation of first-decree murder charges.

In view of *Vasco* and §3D1.2(b) and the potential for state criminal charges carrying significant sentences, a reasonable attorney could have declined to challenge the application of the Guidelines' grouping rules.

Additionally, Silicani was not prejudiced by his counsel's failure to make this argument. As the Court previously noted, Silicani's guideline range was 235-293 months. However, the Court did not sentence Silicani based on the guideline range, but rather based on other factors justifying a significant upward variance. There is no evidence to suggest that the Court would have imposed a different sentence based on a different guideline calculation, especially if that guideline calculation failed to account for Silicani's use of the mail to solicit the murder of two people.

The Court finds Silicani's trial counsel was not ineffective in this case.

### 2. Ineffective Assistance of Counsel – Appellate Attorney

Silicani also appears to suggest that his appellate counsel was ineffective for failing to raise these issues on his direct appeal. In considering whether Silicani's counsel was ineffective on appeal, "our scrutiny . . . must be highly deferential to counsel's conduct." *United States v. Challoner*, 583 F.3d 745, 749 (10th Cir. 2009) (citations and quotations marks omitted). "Every effort must be made to evaluate the conduct from counsel's perspective at the time, and [c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. (citation and quotation marks omitted). "To overcome this strong presumption, a defendant 'bears a heavy burden.'" *Id*. (citing *Fox v. Ward*, 200 F.3d 1286, 1295 (10th Cir. 2000)).

"The omission of a 'viable' issue, however, does not in and of itself constitute ineffective assistance of counsel." *Challoner*, 583 F.3d at 750 (citation omitted). "[The] process of winnowing out weaker arguments on appeal and focusing on those more likely

to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Id*. (citations and quotation marks omitted).

"When, as here, the basis for the ineffective assistance claim is the failure to raise an issue, [a court] must look to the merits of the omitted issue." *United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006) (citation omitted).  In a case where the issue was not raised at the district court, then the Court considers whether the issue would have overcome plain-error review.  *United States v. Pennington*, 219 F. App'x 805, 808 (10th Cir. 2007) (noting that Pennington would not have satisfied plain error review on appeal). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (citations omitted).  "As to the second prong, an error is "plain" if it is clear or obvious at the time of the appeal . . . ." *Id*.

In this case, Silicani's appellate counsel was not ineffective for failing to raise the unit-of-prosecution issue on appeal.  As the Court previously noted, the determination of the correct unit-of-prosecution for § 1958 cases is unsettled in the Tenth Circuit.  Additionally, at the time of Silicani's appeal, only the Sixth Circuit had suggested that multiple convictions under § 1958 were potentially multiplicitous. *See, Wynn*, 987 F.2d at 359 (finding that separate phone calls relating to one plan to murder an individual constituted only one violation of 18 U.S.C. § 1958).  Additionally, there was a later, unpublished Sixth Circuit opinion suggesting a different unit-of-prosecution for § 1958

claims.  See *Ng*, 26 Fed.Appx. at 462 (affirming multiple § 1958 convictions based on an ongoing scheme to commit murder-for-hire).

For all these reasons, any unit-of-prosecution error was not "plain".  Therefore, Silicani's appellate counsel was not ineffective for failing to raise this claim.

For all the same reasons listed above, Silicani's appellate counsel was also not ineffective for failing to raise an argument that his counts were improperly grouped under § 3D1.2(b).  There is no support for this claim because there were two separate victims.

The Court finds that Silicani's appellate counsel was not ineffective in this case.

## B.  Impartiality Issue

Silicani also claims that the magistrate judge was biased because he attended the same church as Silicani's victims, his mother and step-father, and had a "social relationship" with them.  Silicani appears to argue that his counsel was ineffective for failing to raise this issue.

This claim lacks merit.  Even if Silicani's counsel was aware of the magistrate judge's relationship with the victims, the magistrate judge only handled preliminary matters.  This Court took Silicani's plea of guilty and sentenced Silicani.  There is no basis for this Court to find that Silicani's trial counsel was ineffective for failing to raise impartiality issues or that Silicani suffered any prejudice because of the failure.

## CONCLUSION

For all the above stated reasons, Silicani's claims in his § 2255 motion are without merit and are **DENIED**.  The files and record in this case conclusively establish that

Silicani is not entitled to any relief. Accordingly, no evidentiary hearing is required. *United States v. Marr*, 856 F.2d 1471, 1472 (10th Cir. 1988) (no hearing required where § 2255 motion may be resolved on review of record before the Court).

A certificate of appealability (COA) may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons set forth above, Silicani cannot make the required showing and a COA should not issue in this action.

**IT IS ORDERED** that Silicani's Motion Under 28 U.S.C. § 2255 is DENIED;

**IT IS FINALLY ORDERED** that a certificate of appealability shall not issue.

Dated this  28th  day of September, 2018.

NANCY D. FREUDENTHAL
UNITED STATES DISTRICT JUDGE